**UNITED STATES of America**

v.

**Anthony C. CASTELBUONO,**
**Defendant.**

**No. 85 CR 168(S).**

United States District Court,
E.D. New York.

Sept. 10, 1986.

See also 638 F.Supp. 300.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by George Daniels, Marian J. Bachrach, Asst. U.S. Attys., for U.S.

Fisher & Ely, P.C., New York City by Ivan S. Fisher, David W. Ely, Alan Scribner, for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

This case is before the Court for the purpose of deciding the pretrial motions of defendant Anthony C. Castelbuono. Castelbuono is a co-defendant of Victoriano Molina-Chacon and others who were involved in a heroin importation and money laundering conspiracy of huge proportions. Previous decisions of this Court regarding Castelbuono's co-defendants can be found at 625 F.Supp. 338 and 627 F.Supp. 1253. Upon the joint request of Castelbuono and the Government, the Court granted Castelbuono a severance from his co-defendants. The Court also granted Castelbuono's additional request to delay the start of his trial for a substantial and indefinite period of time, based on (i) the Court's finding that the case was a "complex" one within the meaning of Section 3161(h)(8)(B)(ii) of the Speedy Trial Act; (ii) the fact that Castelbuono's lawyer was (and indeed still is) involved in the protracted so-called "Pizza Connection" case in the Southern District of New York; and (iii) Castelbuono's waiver, under oath, in writing and orally in open Court of his right under such Act to move to dismiss for failure of this Court and the Government to give him a speedy trial as well as all of his other rights under such Act. After a lengthy trial of the co-defendants, Victoriano Molina-Chacon, Rudolfo Risatti, Francis DiTommaso and Sheila Silvetti were convicted of various charges related to the heroin and money laundering activities. Defendant Salvatore Messina was acquitted of all charges.

In the present motion Castelbuono seeks the dismissal of the indictment against him or, in the alternative, the suppression of any statements he made as well as any evidence derived directly or indirectly from his statements. The basis of this motion stems from a "limited" cooperation agreement executed by Castelbuono and the Government on November 21, 1983. Pursuant to *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Court held lengthy hearings to determine whether the Government had an independent source for evidence to be used against Castelbuono at trial. In their post-hearing briefs the parties have expressly reserved the issue of whether the Government's evidence is "tainted" by Castelbuono's "cooperation." The sole issue before

the Court is whether Castelbuono breached the agreement, thereby forfeiting any immunity protection it provided.

## I. *Factual Background*

Defendant Castelbuono is a graduate[1] of the Harvard Law School and prior to his current legal troubles practiced law in New York State and also owned several businesses. Whatever Castelbuono's financial success in these endeavors, it apparently was not sufficient for him because he became involved with an international network responsible for the importation of millions of dollars worth of heroin into the United States. In a nutshell, Castelbuono was the mastermind of the money laundering operations of a group of multi-national heroin dealers. Typically, Castelbuono would take delivery of huge amounts of cash that were the small bills proceeds of heroin sales. He then would enlist the assistance of his employees and relatives in transporting the cash to Atlantic City where, after a period of gambling, the small bills would be converted to hundred dollar bills for easier transport. The larger bills would then be transported to the Bahamas or Bermuda and from these locales physically carried to the secret Swiss bank accounts of the heroin ring. The details of some of these transactions will be discussed later in this decision.

Antonio Turano was the Italian heroin importer who originally enlisted Castelbuono's assistance in laundering the heroin proceeds. The organization, of which Turano was a member, utilized shoe importing companies as a cover for their heroin trade. On October 17, 1982, Turano was arrested by agents of the Drug Enforcement Administration ("DEA") for his role in a 15–kilogram heroin transaction. On October 28, 1982, Italian authorities began installing wiretaps on telephones utilized by Gaetano Giuffrida, Turano's partner in heroin trafficking. These wiretaps yielded huge amounts of incriminating evidence against members of the network and Castelbuono's name arose a number of times in connection with his money laundering activities. On January 21, 1983, Italian authorities seized 80 kilograms of heroin destined for one of the organization's shoe company fronts. At the time, this was one of the largest seizures Italian authorities had ever made and it received some press coverage, as did Turano's initial arrest.

After the above events, Castelbuono was no doubt concerned that the authorities were closing in on him. Through an acquaintance, Castelbuono arranged a meeting with DEA Agent Ronald Brogan in the hope of offering his cooperation to the Government. Supposedly concerned for his safety, Castelbuono insisted upon the secrecy of his identity and agreed only to meet with Agent Brogan. During two meetings with Agent Brogan held on February 18 and March 4, 1983, Castelbuono related some details of his money laundering activities for the heroin organization. No representations of immunity were made to Castelbuono at either meeting and it is the position of the Government that apart from any issue related to Castelbuono's later "cooperation," his voluntary statements to Agent Brogan are admissible against him. At their second meeting, Agent Brogan told Castelbuono of the recent murder of Turano, whose body had been discovered on March 3, 1983. This information visibly upset Castelbuono.

In early May of 1983 Castelbuono, along with his attorney, Ivan S. Fisher, Esq., met with Assistant United States Attorneys ("AUSAs") Mark Summers and Gavin Scotti of the Eastern District of New York to discuss the possibility of Castelbuono's cooperation. At that meeting, supposedly out of fear for his personal safety and his alleged belief in his innocence of any crime, Castelbuono suggested such stringent conditions on his cooperation and offered such dramatic departures from the usual cooperation terms that the AUSAs felt his offer was of little value. Later, the AUSAs informed Mr. Fisher that they were not interested in Castelbuono's cooperation. Minutes of Hearing at 134.

---

**1.** He is alleged to have graduated second in his class.

Mr. Fisher made repeated attempts to interest the Government in Castelbuono's cooperation. Finally, on November 21, 1983, a limited cooperation agreement was signed. (A copy of that agreement is attached as an appendix to this opinion.)

Castelbuono's subsequent relationship with the DEA case agents handling the investigation of the heroin ring was strained, to put it mildly. Throughout the relationship, the agents believed Castelbuono's cooperation was half-hearted at best and quite possibly merely a ruse on his part to gain knowledge of the Government's information. Throughout the hearings it was apparent that Castelbuono's "cooperation" consisted of revealing misleading, incomplete tidbits of information and withholding documents, tapes and other information from the Government. Throughout this period, and in the briefs submitted in support of his motion, Castelbuono justifies his recalcitrance on the basis of alleged fears for his personal safety.

In an effort to alleviate Castelbuono's fears and to facilitate more complete cooperation the Government entered into a supplemental oral agreement on February 20, 1984, in which Castelbuono was given veto power over the proposed use of any information which might reveal his identity as an informant. This supplemental agreement did not improve matters. The very next day, exasperated agents rescinded the cooperation agreement after Castelbuono again declined to cooperate fully. The agents thereafter gave Castelbuono another chance to prove the bona fides of his cooperation but Castelbuono was, as usual, unsuccessful in fully recording a conversation with a co-conspirator.

Throughout the latter part of 1984 Castelbuono's relationship with the Government consisted of one of the case agents trying to repossess recording equipment loaned to Castelbuono and Castelbuono trying to entice the agents back into a relationship by revealing selected snippets of information. On March 7, 1985, agents executed search warrants on Castelbuono's residences and arrested him in Utah.

Castelbuono advances two arguments in support of his motions: (1) that he satisfied the terms of the agreement, and (2) that even if he acted in bad faith, *United States v. Kurzer*, 534 F.2d 511 (2d Cir.1976), prevents loss of immunity.

## II. *The Application of United States v. Kurzer*

Castelbuono argues that *United States v. Kurzer* prevents the loss of immunity granted by the cooperation agreement due to any bad faith on Castelbuono's part in fulfilling his end of the bargain. Specifically, the Court in *Kurzer* mentioned in dictum:

> [T]he ordinary remedy for the Government when an immunized witness lies or fails to cooperate fully is a prosecution for perjury or for contempt, rather than abrogation of the immunity agreement and use of the information truthfully given by the immunized witness to prosecute him for other offenses.

*Kurzer* at 518.

The holding in *Kurzer* is clearly distinguishable from this case. The witness/defendant in *Kurzer* had been granted immunity pursuant to 18 U.S.C. § 6003 and was compelled to testify before a grand jury. By statute, Congress has forbidden the use of testimony immunized pursuant to 18 U.S.C. § 6003 in any prosecution except one for perjury, giving a false statement or failure to comply with the court order to testify. See 18 U.S.C. § 6002. The concern here is to insure that the protection afforded to the defendant is co-equal with the Fifth Amendment right against self-incrimination that the defendant is compelled to waive.

By contrast, the present case concerns a defendant who voluntarily sought out the Government with a proposition of cooperation. The resulting agreement was the result of extensive negotiations between defendant and the AUSA. *See* Defendant's Brief in Support of Motion to Dismiss the Indictment and Suppress Evidence at 20 (hereinafter "Defendant's Brief"). There

is no question of compulsion here. Rather, whatever immunity is conferred is governed by the terms of the agreement reached between the parties. In *United States v. Irvine*, 756 F.2d 708 (9th Cir. 1985), the Court dealt with virtually the same argument advanced by Castelbuono and rejected it, noting:

> There is no issue of compelled self-incrimination in this case. Irvine was not required to testify. He testified pursuant to an agreement entered into freely on his own initiative and for his own purposes. Irvine was free to agree to conditions that could not have been imposed upon him had he chosen to claim his Fifth Amendment privilege.

*Irvine* at 712. *Kurzer*'s interpretation of statutory immunity is not applicable to the case at bar.

Under paragraph 2 of the November 21st agreement the Government reserves the right to use any of Castelbuono's statements should he commit any crime subsequent to the date of his cooperation under the agreement. Similarly, under paragraph 3 of the agreement, if it was ever determined that Castelbuono made a statement which was "false in any material respect" the agreement would be null and void and the Government could use Castelbuono's statements or any evidence derived therefrom.

Clearly, by the terms of the agreement, if Castelbuono made any false material statements he would forfeit whatever immunity he had. Castelbuono may not now escape the terms of the agreement he freely bargained for by relying on the irrelevant dictum of *Kurzer*. *See United States v. Stirling*, 571 F.2d 708, 730–32 (2d Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) (defendant's failure to fulfill terms of plea agreement allowed Government to use grand jury testimony in later prosecution); *United States v. Pellon*, 475 F.Supp. 467 (S.D.N.Y.1979), *aff'd*, 620 F.2d 286 (2d Cir.1980) (non-prosecution agreement not a grant of full immunity, *Kurzer* does not apply, defendants got what they bargained for).

Thus, if the Court finds that Castelbuono made a statement that was false in any material respect it is clear that he has forfeited any immunity conferred upon him by the agreement and the Government is not limited to a prosecution for perjury or false statement. The Government also argues that Castelbuono breached the November 21st agreement by his overall lack of good faith in fulfilling his obligations under it. Castelbuono argues that without an explicit provision in the agreement imposing a loss of immunity for a lack of good faith, *Kurzer* must apply.

Castelbuono's argument is incorrect. As the Court has clearly demonstrated, *Kurzer* involved only statutorily imposed immunity, granted through compulsion. When a defendant acquires immunity via an agreement, as here, the remedies of the parties are governed by that agreement. Here, Castelbuono was clearly put on notice by paragraph 3 of the November 21st agreement that a violation of its terms would result in the loss of immunity. A cooperation agreement such as the one signed here is a contract governed by the relevant principles of contract law. *See Irvine, supra,* at 710. If the Court should find that even though the defendant did not make false statements he still breached the agreement through his bad faith, the Court must then look to the terms of the contract for the appropriate remedy the parties intended in case of breach. It is clear from the terms of the agreement that a breach by Castelbuono would result in a loss of immunity for previous statements, there is no indication of an intention to limit the Government's remedy in case of breach to a prosecution for perjury or false statement.

To accept Castelbuono's argument would result in a bad public policy. Pre-indictment cooperation agreements such as the one here are entered into by the parties with the understanding that their rights are governed by the terms of the agreement. If this Court held that the Government was limited to a prosecution for perjury or false statement in those cases

where defendants in bad faith did not fully comply with their obligations, the Government would be reluctant ever to enter into a cooperation agreement and a useful investigative tool would be lost. Defendants facing the possibility of extensive criminal charges would be eager to enter into cooperation agreements knowing that if they were poorly drafted (as was the agreement here) and did not specify with particularity the consequences related to every possible breach, it might be possible in bad faith not to comply with the demands of the agreement and still limit one's exposure to a charge of perjury. Also, a defendant could make no false statement at all, simply refuse to cooperate or cooperate in a very limited way, thereby selectively immunizing himself and face little, if any, penalty. The Court will not encourage such absurd results.

## III. *Breach of the Agreement*

### A. *The Requirements of the November 21st Agreement*

In interpreting a cooperation agreement like the one in the present case a court must give it a reasonable interpretation, an interpretation that will not produce a ridiculous result. It must be construed so as to carry out the intentions of the parties in light of all the facts and surrounding circumstances. *Irvine, supra,* at 710–11.

Defendant's proposed interpretation of the agreement would impose virtually no affirmative obligation on his part:

> Castelbuono was not obligated to do anything specific under the agreement other than to avoid material misstatements. He *was not obligated to cooperate.* He hoped that the value of *what he decided to tell* the government would persuade them not to prosecute.

Defendant's Brief at 2 (emphasis added).

To accept this interpretation of the cooperation agreement would produce absurd results. What the defendant is essentially saying is that he reached an agreement with the Government whereby he received the right to immunize himself selectively from prosecution while the Government received nothing in return. This interpretation would eliminate any consideration in the contract and render it null and void.

That the above was not the intention of the parties is clear. AUSA Summers, who together with defendant's attorney, Ivan Fisher, Esq., drafted the cooperation agreement, testified as to the negotiations preceding it. His testimony shows that the parties did not expect Castelbuono to play a passive role in the Government's investigation of the heroin conspiracy. Indeed, one of the key inducements for the Government in entering into the agreement was Castelbuono's representations that he could lure co-defendant Molina-Chacon out of Spain into a country where United States authorities could arrest and extradite him. Minutes of Hearing at 145.

It is true that nowhere in the November 21st agreement is there a provision explicitly requiring Castelbuono to do a particular act. However, this does not mean that the thrust of the agreement is to impose no obligation on Castelbuono, that he is free to perform or not perform as he so chose. This case is much like one which most law students read in their first year contracts class, *Otis Wood v. Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917). In *Lady Duff-Gordon* the Court noted that: "A promise may be lacking, and yet the whole writing may be instinct with an obligation imperfectly expressed." Just as in *Lady Duff-Gordon,* in which the plaintiff had an implied obligation to use reasonable efforts to market the designs of the defendant, so too in the present case did Castelbuono have an implied obligation to use reasonable efforts in supplying information to and cooperating with the Government. In this regard the Government's argument that implicit in every contract is a requirement of good faith and fair dealing is well taken.

### B. *Lack of Good Faith*

The Government argues that Castelbuono has breached the cooperation agreement by a lack of good faith in his performance.

In support of this contention the Government asserts that Castelbuono, among other things, (1) withheld important documents and tapes from the Government of significant evidentiary value; (2) claimed an inability to recall material and significant details, such as dates and times of transactions and the names of people involved when in fact he hoarded documents that contained this information; and (3) purposely omitted important facts concerning certain money laundering ventures.

In response, defendant does not really dispute the Government's contentions, rather, he suggests his conduct was justified and understandable. Castelbuono suggests that he did not trust the Government and claims that the Government acted in bad faith by never reducing to written form the supplemental agreement providing him with a veto power over the use of information which might reveal his identity. Thus, Castelbuono's recalcitrance was not bad faith but, as he puts it, "circumspection." The defendant claims he had a legitimate fear for his life and was worried that the Government would not insure the confidentiality of his identity. Therefore, Castelbuono acted with extreme caution in response to Government requests for information. Defendant also argues that the omitted facts were of little importance and that the information he did provide the Government was valuable.

Castelbuono's arguments are unconvincing. The oral supplemental agreement could have been fully enforceable had Castelbuono sought enforcement. *See, e.g., Matter of Wellins,* 627 F.2d 969 (9th Cir. 1980). Furthermore, there is no indication in the record of any lack of diligence on the Government's part regarding Castelbuono's physical safety. Indeed, testimony at the pretrial hearing indicated that Castelbuono himself refused efforts by the Government designed for his better protection. Minutes of Hearing at 237–40. An analogy can be drawn to the situation where an immunized witness refuses to testify out of fear of retaliation. The witness must take steps to avoid the danger, otherwise there may be no defense of du-

ress to a later contempt charge. *See United States v. Patrick,* 542 F.2d 381 (7th Cir.1976). Similarly, for Castelbuono it is no excuse for his failure to cooperate completely that he was in physical danger when he did not pursue ways of avoiding that danger.

The value of the information Castelbuono supplied put aside, the most convincing evidence of his bad faith is the intentional omissions of information. Contrary to Castelbuono's view they are not of little importance. With regard to a November 1982 money laundering venture Castelbuono neglected to tell Government agents that he had previously sent two of his underlings on an expedition to the Canadian border in an attempt to find a point of passage without Customs' checks. Nor, in explaining the actual transport of money by one of his male associates from Atlantic City to Switzerland via Bermuda, did Castelbuono mention to the agents that he had also sent along a female employee and had the two of them travel under assumed names as a married couple. Moreover, Castelbuono had in his apartment a large bag full of documentary evidence of his money laundering activities which he deliberately withheld from the agents, and on more than one occasion he "covered" for his co-conspirators by failing to operate properly the tape recorder loaned to him by the agents. In co-defendant Messina's case this machination on Castelbuono's part cost the Government their rightful conviction of this drug offender with a prior conviction.

Although an inadvertent omission or oversight would not rise to the level of a materially false statement so as to constitute a breach of the agreement, a bad faith, intentional, substantial omission such as the ones mentioned above does constitute a materially false statement and thereby a breach of the agreement. This is especially so when coupled with Castelbuono's overall recalcitrance.

A similar situation arose in *United States v. Skalsky,* 621 F.Supp. 528 (D.N.J. 1985). In *Skalsky* the defendant agreed,

pursuant to a cooperation agreement, to give complete, truthful and accurate information to the Government. When questioned about a transaction involving an option to purchase some property in Atlantic City the defendant told agents that a *lis pendens* had been filed against the property but failed to mention that the defendant and another individual had shared in a $250,000 settlement resulting from the litigation over the property. Although he was not specifically questioned about the settlement, the Court held the defendant's statement to be an affirmative misrepresentation, noting:

> [T]his partial disclosure of the facts was also misleading. In other words, half of the truth may obviously amount to a lie, if it is understood to be the whole.

*Skalsky* at 533 (quoting Prosser, *The Law of Torts*).

In discussing defendant's overall obligation under the agreement, the Court in *Skalsky* noted:

> Furthermore, when the Government, in the exercise of its discretion, grants immunity or, as here, agrees not to prosecute, we hold that more is required of the recipient than just to respond narrowly or evasively to specific questions. The spirit of cooperation demands more.

*Skalsky* at 532.

■ Castelbuono was obligated not to make statements which were materially false. The logical implication of this duty was that Castelbuono was supposed to provide accurate and truthful information like the defendant in *Skalsky*. The intentional, material omissions by Castelbuono were a dereliction of this obligation. They certainly did not constitute reasonable efforts to supply information and cooperate nor did they amount to good faith and fair dealing. The Court concludes that by these bad faith actions Castelbuono breached the agreement and it is thus null and void.

### C. *Material Falsehoods*

■ Even if, *arguendo*, Castelbuono's overall bad faith compliance with the agreement and material omissions did not amount to a breach, the Government has shown at least two instances in which Castelbuono made outright, material, false statements to the Government and thus breached the agreement.

The first involved a money laundering venture Castelbuono undertook for Turano in March of 1982. Castelbuono told DEA agents that he received $794,000 from Turano which he took to the Bahamas by boat. In the Bahamas, Castelbuono told the agents, he deposited the money into an account of an off-the-shelf corporation and immediately wired $630,000 to the heroin organization's Swiss bank account. The rest of the funds Castelbuono deposited in a Bahamian interest-bearing time deposit account. Castelbuono claimed that Turano became enraged upon discovering that not all of the funds had been immediately wired to Switzerland and thus, Castelbuono was forced to wire directly the additional funds, resulting in the loss of interest and penalties.

The Government later learned through documentary evidence that Castelbuono actually deposited $854,105 in the Bahamas, a difference of some $66,000 from the amount he told the Government. This amount was what Castelbuono pilfered from his criminal confederates. The theft is evidenced by the fact that Castelbuono did not wire the money left on time deposit directly from the Bahamas to Switzerland but rather sent $140,000 from the accounts of one of his New York companies to Switzerland. Months later Castelbuono received $206,500 that had been on time deposit in the Bahamas. The difference between the money Castelbuono sent to Switzerland ($140,000) and the amount he received and retained for himself from the Bahamas, $206,500, is $66,500.

Castelbuono's explanation that a large part of the discrepancy is explained by a $60,000 debt Turano owed Castelbuono is patently false. This so-called "debt" was actually a sham transaction that was employed as a cover for an earlier laundering of narcotics proceeds. His further argument that in any event this misstatement is

immaterial because he described the transaction with "93% accuracy" is also unavailing. Castelbuono lied to cover up his theft from his co-conspirators. This Court holds this to be a material falsehood as a matter of law.

The second materially false statement involved another of Castelbuono's money laundering schemes. Castelbuono told agents of an alleged swap of money in June of 1982. Castelbuono received $800,-000 in small bills from Turano which he and some of his employees took to Atlantic City. After some gambling the money was converted into larger denominations. Castelbuono and his entourage then flew to Teterboro Airport in a Lear Jet and checked into two rooms in a nearby motel.

In order to avoid moving money across the border of the United States, Castelbuono claims to have arranged a "swap" with a business associate from the Bahamas, Robert Cordez. According to Castelbuono, at the Teterboro motel he met with a representative of Cordez, the mysterious "Charles," a man with salt and pepper hair whom Castelbuono had never seen before. Castelbuono gave Charles the money just laundered in Atlantic City and then returned to New York City by car. From New York Castelbuono flew on to Bermuda where he met with some of his staff, in particular Dirk Velton, who had already arrived in Bermuda via the aforementioned Lear Jet. Castelbuono claims to have met in a five to ten minute interval between flights another Cordez representative in a men's room at the Bermuda Airport and received an equivalent amount of cash from this man. Without any explanation as to how he counted or stored it, he then, together with Velton, flew on to Switzerland via Montreal, where they deposited the funds in one of the heroin organization's accounts. By this method Castelbuono contends no currency physically crossed the United States border and therefore the transaction was lawful.

The testimony of Castelbuono's employee, Dirk Velton, demonstrates Castelbuono's swap story to be a complete fabrication. Velton's account shows that the particularly described satchels of money from the Atlantic City trip were immediately loaded into the bottom of the Lear Jet at Teterboro and were not disturbed until their arrival in Montreal where the money was finally off-loaded in the same satchels. Castelbuono's return to New York City by car and then flying commercially to Bermuda was his underhanded method of shifting the risk of transporting currency out of the United States without filing the appropriate reports onto Velton, who flew with the currency from Atlantic City to Bermuda.

Velton's testimony gave no support to Castelbuono's story about meeting a "Charles" in Teterboro. The testimony of Castelbuono's cousin, Ben Valenza, about a "knock on the door" in Teterboro is in the opinion of the Court also fabricated. The Court discredits Valenza's testimony, which is at worst a lie and at best a confused memory.

Castelbuono's attempts to explain away Velton's testimony are simply too incredible to be believed. For example, in response to Velton's testimony that the suitcases of money remained in the Lear Jet from Teterboro to Montreal, Castelbuono offers that perhaps the money (after being picked up in the Bermuda men's room) was placed into the suitcases after boarding in Bermuda or during the flight to Montreal or at the Montreal Airport. Defendant's Brief at 54. Velton testified that the suitcases with the money were placed beneath all the other luggage behind the seats of the aircraft. Minutes of Hearing at 2664–66. Velton also testified that the bags containing the cash were in exactly the same place when they were off-loaded in Montreal as they were when first loaded onto the plane in Teterboro. Minutes of Hearing at 2887–88. Castelbuono would have this Court assume that somehow the money got into these suitcases after arriving in Bermuda, not when Velton saw them loaded in Teterboro. The Court refuses to accept this fantasy, which the defendant admits he has no testimony to support. Defendant's Brief at 54.

The Court, after judging the credibility of the testimony of the witnesses given at the hearings, holds this "money swap story" of Castelbuono to be a materially false statement and one which was willfully and deliberately made to cover up his willful violation of the currency laws.

Either one of the materially false statements described above is sufficient in and of itself to constitute a breach of Castelbuono's cooperation agreement and this Court so holds.

## CONCLUSION

Having found that the defendant breached his cooperation agreement both through bad faith omissions and material false statements, the Court finds the cooperation agreement by its terms to be null and void. The Court need not address the other points raised by the parties. The defendant's motion to dismiss the indictment or in the alternative to suppress statements and derivative evidence is denied.

SO ORDERED.

## APPENDIX

November 21, 1983

Ivan Fisher, Esq.
442 East 58th Street
New York, New York 10022

Re: Anthony Castelbuono

This letter is to memorialize our agreement regarding the circumstances under which this office and agents of the Drug Enforcement Administration will interview your client, Anthony Castelbuono. Our understanding is as follows:

1. Castelbuono will waive his Fifth Amendment privilege against self-incrimination and, in return, the United States Attorney for the Eastern District of New York and Drug Enforcement Administration will use none of Castelbuono's statements against him in any criminal prosecution, nor will any evidence derived from leads provided by Castelbuono's statements be used against him in any criminal prosecution, except that we reserve the right, should Castelbuono take the witness stand at any trial, to cross-examine him based on his statements if his direct testimony in any way contradicts or conflicts with statements previously made by him under the terms of this agreement.

2. Should we develop any evidence, either through the use of Castelbuono's statements, leads derived therefrom or otherwise, that Castelbuono commits any crime subsequent to the date of any statements he makes to us under the terms of this agreement, we shall have the right to prosecute him for any such crime or crimes and to use any statements he makes under the terms of this agreement against him in such a prosecution.

3. Should it at any time be determined that any statement made by Castelbuono under the terms of this agreement is false in any material respect, the provisions of this agreement shall be deemed null and void and we shall have the right thereafter to utilize any statements made by Castelbuono or any evidence derived from leads obtained therefrom against him in any criminal prosecution.

4. The government agrees that, in the event Castelbuono is ever charged with a crime, this office will make known to the sentencing court the fact that he provided information to us under the terms of this agreement and an evaluation of its truthfulness and its prosecutive and investigative value. It shall be solely within the discretion of this office and the Drug Enforcement Administration to determine both the truthfulness and the value of any information provided, and we make no representations with regard to any sentence which Castelbuono might receive nor do we agree to make any specific sentence recommendation.

5. We further agree that should Castelbuono, as a result of any information provided by him to us under the terms of this agreement, be placed in a life threatening situation, this office and the Drug Enforcement Administration shall take whatever steps we deem necessary to protect him. It shall be solely within the discretion of this office and the Drug Enforcement Administration to determine whether such a life threatening situation exists and what, if any, protective measures are necessary under the circumstances.

6. Finally, the United States Attorney for the Eastern District of New York and the Drug Enforcement Administration reserve the right to criminally prosecute Castelbuono based upon any information known to us, or evidence derived from leads obtained therefrom, prior to the time he makes any statements to us under the terms of this agreement. We also agree that any such prosecution shall not be based upon any statements or leads derived therefrom made by Castelbuono to Assistant United States Attorneys Mark Summers and Gavin Scotti in July, 1983, since it is the position of this office that those statements were not material nor did they have any investigative value. Furthermore, any such prosecution may also be premised either in whole or in part on any evidence developed subsequent to the making of any such statements so long as such evidence is obtained independently of Castelbuono's statements under the terms and conditions set forth in paragraph one of this agreement.

If this letter accurately reflects our understanding, would you and your client endorse as indicated below.

Very truly yours,
RAYMOND J. DEARIE
United States Attorney
Eastern District of New York

By: /s/ Mark A. Summers
MARK A. SUMMERS
Assistant U.S. Attorney
Eastern District of New York

I have read this letter and it accurately reflects our agreement with the United States Attorney for the Eastern District of New York and the Drug Enforcement Administration.

/s/ Ivan Fisher
IVAN FISHER, ESQ.
Attorney for Anthony Castelbuono

/s/ Anthony Castelbuono
ANTHONY CASTELBUONO