UNITED STATES of America,
Plaintiff–Appellant,

v.

James P. FITCH, Defendant–Appellee.

No. 91–1743.

United States Court of Appeals,
Sixth Circuit.

May 20, 1992.

Christopher P. Yates (argued and briefed), Detroit, Mich., for plaintiff-appellant.

Joan E. Morgan (argued and briefed), Detroit, Mich., for defendant-appellee.

Before: MERRITT, Chief Judge; NORRIS, Circuit Judge; and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Plaintiff, the United States government, appeals the dismissal of an indictment against the defendant, James P. Fitch, on the ground that the parties' agreement not to prosecute became invalid, and could no longer be interposed to bar prosecution, once Fitch breached the terms of the agreement. For the reasons which follow, we affirm the decision of the district court.

### I.

In 1988, defendant Fitch served as a courier in a drug trafficking operation in the Detroit area. Fitch frequently went on overnight trips to transport cocaine to Detroit. Fitch stored cocaine in the basement of a house in Detroit owned by his girlfriend, Amanda Turner.

In June 1988, Turner bought a round-trip airline ticket to Florida, intending to visit her sister. Before leaving, Turner told Fitch that she would be staying at her sister's, and gave him her sister's address and telephone number. While Turner was in Florida, Fitch surprised her by visiting her at her sister's house. Fitch told Turner that he was staying at the Holiday Inn in Hialeah.

On June 21, 1988, Fitch was admitted to the Palm Springs Hospital in Hialeah, where he shared a room with a 74-year-old Cuban man named Jose Pons. Fitch informed Pons that he drove a truck, but the subject of drug trafficking never came up. Pons received several visitors while in the hospital, but no one named "Marcos" or anyone of Colombian nationality came to see him.

While Turner was visiting Fitch in the hospital, he instructed her to go to the Holiday Inn to receive a telephone call. Fitch told Turner to take a message and inform the caller that he was in the hospital. Turner followed Fitch's instructions and received a call from a man named "Marcos," who provided a beeper number at which he could be reached. The caller further informed Turner that "a young woman would come to the room at the Holiday Inn and give [Turner] a key to a truck." A woman did, in fact, arrive at the Holiday Inn to deliver a key to a blue pickup truck that was parked outside the Holiday Inn. Turner relayed the key and beeper number to Fitch.

When Fitch was released from the hospital, he and Turner returned to the Holiday Inn. Fitch and Turner then drove the blue pick-up from the Holiday Inn to an apartment where Fitch met the woman who had given the key to Turner. Fitch emerged from the apartment with the woman and a man, returned to the pick-up truck, and drove to Turner's sister's home. On the following morning, Turner and Fitch left for Michigan in the pick-up truck.

Soon after arriving at Turner's home in Detroit, Fitch made a telephone call, and then "Rob" came in to see him. After a brief conversation with Fitch, "Rob" left the house carrying a brown paper bag. Turner testified that she found several bricks of cocaine, wrapped in newspaper, inside of her blue duffel bag which was kept in her house.

Shortly thereafter, Fitch became "very upset" about his partners' mistreatment of

him. Fitch complained to Turner that his partners had not acted on their promise to buy him a truck despite the fact that other members of the operation received cars and jewelry. Fitch packed his belongings, and hurriedly left for Arkansas in his pick-up truck. Later that day, Rob appeared at Turner's house to determine Fitch's whereabouts. Turner gave him no information. Rob returned with "Lawrence," surveyed the basement, and became upset when they found it empty. Lawrence complained that Fitch had taken all "the dope" and more than $100,000 in cash. Turner did not know how much "dope" Fitch had stored in the basement, but guessed that it was "quite a bit." Turner refused to tell the men where Fitch went, but then relented when they held several firearms to her head. As soon as Fitch's partners learned from Turner that Fitch had gone to Little Rock, Arkansas, they bought plane tickets to pursue him.

On July 13, 1988, Fitch saw his partners in Little Rock and became extremely distraught. The next morning, Fitch went to the FBI office in Little Rock, because "he needed to talk to some agents." Fitch told the agents that he had "been involved in a situation in which [he] was taking drugs or cocaine from Florida to Detroit, Michigan." He stated that he had fallen "in disfavor with those he was involved with" and "had taken three of the packages of cocaine from Detroit and brought them to Little Rock."

Fitch told the agents about his trip to Florida with Turner, and advised the agents that while in the hospital "he was approached by his roommate who he described as a Colombian male." Fitch said that this Colombian roommate introduced him to another Colombian named "Marcos," and that both men "offered him $3,000 to deliver the cocaine from Florida to the Detroit area." Fitch additionally indicated to the agents that "Marcos" gave him the pick-up truck he drove to Detroit, as well as the beeper number of "Rob." Fitch claimed that "Rob" instructed him to store the cocaine at Turner's house.

After Fitch had related the general history of his activities to the agents, he sought to strike a deal. The FBI agents referred him to Assistant United States Attorney Terry Derden. The AUSA entered into an informal immunity agreement signed by Fitch and the Assistant U.S. Attorney Derden on September 13, 1988. Although the agreement refers to "use immunity" the government has subsequently conceded that the agreement not to prosecute conferred "transactional immunity" upon Fitch.

Once Fitch received immunity, he led agents to three pounds of cocaine hidden in the Little Rock area. Fitch also participated in recorded telephone conversations with people from Detroit, travelled to Detroit at the government's expense to assist in the investigation of his former partners' cocaine operation, and complied with any other requests that the agents made of him.

However, a number of discrepancies in Fitch's statement arose. It was learned that Fitch was not, in fact, introduced to "Marcos" by his hospital roommate. The testimony of Turner and Jose Pons (the roommate), coupled with the hospital records tended to discredit Fitch's account. In addition, the government contends that Fitch falsely claimed that he left 12 to 14 pounds of cocaine in Detroit and turned over all the cocaine—three pounds—that he had taken to Little Rock. The government argues that Fitch brought all 14 pounds of the cocaine to Little Rock, turned over only 3 pounds, and kept the rest for himself. However, there is no testimony to support the claimed discrepancy. Turner only testified that Fitch took "all the dope." She testified that she never checked her basement after Fitch left for Arkansas. Therefore, there is little factual support for the government's theory that Fitch lied about the amount of cocaine, keeping the excess to himself.

Eventually, Fitch became a target of the investigation, rather than a cooperating witness. The Detroit investigation culminated in the return of a 16–count indictment on June 21, 1990. Defendant Fitch

was among those charged with conspiring to distribute, and to possess with intent to distribute, cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846.

On April 7, 1990 Fitch filed a written motion to dismiss the indictment, interposing his immunity agreement as a bar to the charge pending against him. An evidentiary hearing took place before the United States District Court on September 25, 1990, October 11, 1990 and October 12, 1990. The district court issued an order of dismissal on October 29, 1990, denying the government's claims that Fitch's inconsistent statements and falsehoods abrogated the agreement not to prosecute, and exposed him to criminal liability. The district court reasoned that, to the extent that Fitch's falsehoods were proven, they did not rise to the level of material breaches of the agreement not to prosecute. Secondly, even if Fitch did materially breach the agreement, the district court held that the government's only recourse was through the provisions of the agreement which allowed Fitch to be prosecuted for perjury. There was no provision in the agreement which operated to void the agreement upon breach, or which allowed the government to pursue other criminal charges against the defendant.

The government filed a timely notice of appeal from the district court's order on June 24, 1991.

### II.

Plaintiff, United States government, first argues that the district court erred in concluding that Fitch's lack of candor did not amount to a material breach of the immunity agreement. We are unable to say that the district court's determination was clearly erroneous. *United States v. Barrett*, 890 F.2d 855, 863 (6th Cir.1989).

■ To secure a defendant's cooperation in a criminal investigation, the government may informally grant him immunity in exchange for his testimony. *United States v. Pelletier*, 898 F.2d 297, 301 (2nd Cir.1990). An agreement not to prosecute is contractual in nature, and subject to contract law standards. *United States v.*

*Brown*, 801 F.2d 352, 354 (8th Cir.1986). The conditions which will constitute a breach of the immunity agreement are governed by the agreement itself. *United States v. Packwood*, 848 F.2d 1009, 1012 (9th Cir.1988). If a firm agreement has been entered into, the government bears the burden of proving that the defendant failed to satisfy his part of the deal. *Brown*, 801 F.2d at 355. The courts are split as to whether the burden of proof is governed by the preponderance of the evidence standard, *Packwood*, 848 F.2d at 1011 (plea agreement) or the "adequate evidence" standard, *United States v. Gonzales–Sanchez*, 825 F.2d 572, 578 (1st Cir.) (plea agreement), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). In any event, the most important consideration is the incriminating nature of the proferred statements, not the amount of information provided to the government. *United States v. Johnson*, 861 F.2d 510, 513 n. 3 (8th Cir.1988).

■ In the instant case, the district court held that the government must prove that any breach was material and substantial. The court cited *United States v. Castelbuono*, 643 F.Supp. 965 (E.D.N.Y.1986), which held:

Although an inadvertent omission or oversight would not rise to the level of a materially false statement so as to constitute a breach of the agreement, a bad faith, intentional, substantial omission ... does constitute a materially false statement and thereby a breach of the agreement.

*Id.* at 971. Because we are governed by normal "contract law standards," *Brown*, 801 F.2d at 354, we agree that *Castelbuono* sets forth the proper standard by which to measure the significance of a breach of an informal immunity agreement.

■ In the present case, we concur with the district court that Fitch did not materially breach his agreement. The government contends that Fitch, by falsely implicating his hospital roommate as the source of the drug deal, materially breached the immunity agreement. It is true that

the immunity agreement required that Fitch "supply complete and truthful information and data to the attorneys for the government." Joint Appendix at 242. In addition, it prohibited Fitch from protecting "any person through false information or omission [or] falsely implicat[ing] any person or entity." *Id.* However, under *Castelbuono* and *Brown,* the breach must be substantial and material. The district court held that Fitch's conduct was nothing more than an "effort to minimalize his own involvement," and that the government was not misled by the untruths. Joint Appendix at 41. We agree. In light of all the incriminating information supplied by Fitch, we do not find that this fabrication was sufficient to constitute a substantial material breach. Furthermore, the government failed to prove that Fitch fabricated the story about turning over all the cocaine which he transported from Detroit. There was no testimony given at the evidentiary hearing from which it could be concluded that Fitch ever had any more than three pounds of cocaine. Therefore, we find that the government cannot rely on this rationale to support its theory of material breach.

Under *Johnson, supra,* whether a defendant has breached his agreement depends, in part, on the incriminating nature of the testimony given by the defendant. In this case, Fitch supplied the government with enough information to allow it to secure a multicount indictment against numerous individuals. He also assisted the investigation in various other ways. Therefore, we must conclude that the government received the benefit of its bargain, and the agreement should be enforced.

However, even if Fitch's conduct amounted to a material breach of the agreement, we believe that the government would nevertheless be prohibited from prosecuting him on the substantive charges in the indictment, because it is limited to those remedies specified in the agreement.

### III.

Assuming that Fitch materially breached the immunity agreement, plaintiff argues that the district court erred in limiting its remedies to those spelled out in this agreement. The agreement provides that Fitch "can and will be prosecuted for any knowing materially false statement made under oath, as perjury." Joint Appendix at 242. In addition, the agreement provides that Fitch may be prosecuted for any subsequent crimes or any prior undisclosed crimes. *Id.* at 243. The district court noted that "the agreement does not specifically provide that defendant can be prosecuted for the immunized crimes if he did not provide complete and truthful information." *Id.* at 41.

The questions presented in this case are problematic simply because the courts have not developed a coherent body of caselaw dealing with the breach of informal immunity agreements. Rather, the law in this area is a patchwork, the courts drawing on related issues such as breach of plea bargain agreements and breach of formal immunity agreements made pursuant to 18 U.S.C. §§ 6002 *et seq.* as well as law governing informal immunity agreements. The government, borrowing caselaw from the plea bargain context, argues that Fitch's breach operates to void the immunity agreement, thus freeing the government to prosecute the defendant. Indeed, the courts have held that "a defendant's failure to fulfill the terms of a pretrial [plea] agreement relieves the government of its reciprocal obligations under the agreement." *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). However, a more careful review of the caselaw reveals that this proposition is not as broad as the government suggests.

The government may informally agree with a defendant to provide transactional immunity in exchange for incriminating information. Transactional immunity is full immunity from prosecution for any offense to which the testimony relates. *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972). This immunity prohibits the government from prosecuting the defendant at any time with respect to incrimina-

ting matters that the witness disclosed. *United States v. Weaver*, 905 F.2d 1466, 1475 (11th Cir.1990). Due process requires the government to adhere to the terms of any immunity agreement it makes. *Pelletier*, 898 F.2d at 302 (citing *Mabry v. Johnson*, 467 U.S. 504, 509, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984)).

■ If a breach of an immunity agreement is established, the available remedies are those specified in the agreement. *Id.*; *United States v. Irvine*, 756 F.2d 708, 710–12 (9th Cir.1985); *United States v. Stirling*, 571 F.2d 708, 731–32 (2nd Cir.), *cert. denied*, 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Most closely on point to the issues presented in the instant case is *United States v. Pelletier*, 898 F.2d 297 (2nd Cir.1990) wherein the Second Circuit held that the government's remedies were limited by the contract. In *Pelletier*, the parties entered into an immunity agreement which provided:

> [I]n the event that you intentionally lie under oath before this grand jury ... you can be prosecuted for perjury.
>
> ....
>
> You also understand that while you cannot be prosecuted for anything that you state here today, you can be prosecuted for perjury in the event that you intentionally lie.

*Id.* at 302. The defendant lied in violation of the agreement, and the government sought to prosecute him on the substantive charges, instead of perjury. The court held:

> Having granted ... immunity and having further limited itself to using [defendant's] ... testimony against [him] only in the event [defendant] intentionally lied, and even then only in a prosecution for perjury, the government was not free to use that testimony either to indict or to obtain convictions on nonperjury charges.

*Id.* The reasoning of *Pelletier* strikes us as sound. Therefore, we believe that it should be followed, and, according to standard contract principals, we must limit the government to the remedies which they consented to in the agreement. Although

there is caselaw that suggests that an immunity agreement is void upon the defendant's breach, the courts have so held only where the agreement explicitly provided that any falsehood would void the agreement, *Pelletier*, 898 F.2d at 302; *United States v. Skalsky*, 857 F.2d 172, 176 (3rd Cir.1988); *Castelbuono*, 643 F.Supp. at 969, or where the agreement was silent as to remedies, *United States v. Reardon*, 787 F.2d 512, 515–16 (10th Cir.1986) (plea agreement silent).

By contrast, in the instant case, the immunity agreement did not provide that it would be "null and void" in the event Fitch lied, nor was it silent as to the consequences to Fitch of telling a lie. Instead, the agreement provided that Fitch could only be prosecuted for perjury, and we believe that the government should not be permitted to argue that it is not now bound by that provision.

This result is supported by *United States v. Black*, 776 F.2d 1321 (6th Cir. 1985), where this circuit held that a defendant, who gave untruthful testimony in violation of an immunity agreement, may be prosecuted for perjury. However, the immunity agreement also explicitly stated that if the defendant was not truthful "the United States Attorney ... will fully prosecute you on all criminal charges which can be brought against you." *Id.* at 1323. The court stated that it had "grave doubts about the validity of this portion of the agreement." *Id.* at 1326. Should the government attempt to bring substantive charges against the defendant "on the ground that he had failed to comply with all of his obligations under the immunity agreement, the district court must consider carefully whether the provisions permitting prosecution in the event of a breach ... is [sic] enforceable." *Id.* These concerns, however, are more strongly implicated in the instant case, because the agreement did not even contain such a provision. Moreover, we are reluctant to imply a term to the contract which may, in this circuit, be of questionable validity. Therefore, we conclude that the government is limited to

its contractually agreed-upon remedy of prosecuting Fitch for perjury.

## IV.

For the foregoing reasons, the decision of the district court is hereby AFFIRMED.