NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0146n.06

No. 20-1141

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
|  | ) | Mar 19, 2021 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
|  | ) |  |
| v. | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| CHRISTOPHER STATON, | ) | COURT FOR THE EASTERN |
|  | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellant. | ) |  |
|  | ) |  |

Before: WHITE, LARSEN, and NALBANDIAN, Circuit Judges.

LARSEN, Circuit Judge. Former Detroit Police Officer Christopher Staton used his position as an officer and his access to sensitive law enforcement information to aid his childhood friend's multi-million-dollar drug enterprise. His ties to the enterprise were eventually revealed, and a jury found him guilty of conspiracy to distribute controlled substances. He was sentenced to 216 months' imprisonment. On appeal, he challenges the admission of his proffer statements, the sufficiency of the evidence, and his sentence. We AFFIRM.

I.

Staton grew up with Meltwaine Dukes, who later became the leader of a drug enterprise in Detroit, Michigan. Staton was involved in Dukes' drug enterprise before becoming a police officer with the Detroit Police Department (DPD). But putting on a uniform did not stop Staton from assisting Dukes; he instead used his position to help Dukes in ways that he could not before. Eventually, the Drug Enforcement Agency (DEA) caught on to Dukes and later, Staton.

The DEA began investigating Dukes in 2013 and started to intercept cash and drugs from known participants in his organization. Because the DEA agents had not identified everyone in Dukes' drug-trafficking network, they began authorized wiretaps of his cellphones in June 2017. The wiretaps revealed Dukes' concern that one of his associates had lied about a drug shipment being seized; Dukes believed the associate might have fabricated a traffic stop as a cover story. Dukes called Staton to discuss the alleged traffic stop, and Staton agreed to get "in the system" for Dukes and determine whether the stop happened and whether drugs were in fact seized.

These recorded conversations alerted DEA agents that a DPD officer was involved, so they contacted the FBI's public corruption unit. With the court's permission, the FBI initiated a wiretap of Staton's phone. The agents learned that Staton was using a restricted database, referred to as the Law Enforcement Information Network (LEIN), to run license plates for Dukes. Staton would relay information to Dukes, such as the name and location of the person who registered the vehicle, and he understood that he was passing along the information of an individual involved in drug activity. Staton also used the database multiple times to find out whether law enforcement had warrants for, or had otherwise inquired about, Dukes and his associates.

Through the wiretaps, agents also learned that Staton and Dukes were negotiating a drug deal. Staton asked Dukes, "Anything come up on that situation[1] we talked about?" Staton said he wanted some "smart numbers," to which Dukes replied, "I'm trying to get the sweetest number we can get." Ten days later, Staton texted Dukes and asked about an address. Dukes responded, "They want 70[2] . . . . It's still at the dealership. No miles on it" (meaning the drugs are uncut or have not been diluted). The next day, Staton asked to meet Dukes so he could get a "piece"

---

[1] The two referred to drugs as "the situation."

[2] During the time of the investigation, the average price of a kilogram of heroin was $70,000.

(a sample) from him. Eventually, Staton wanted to meet Dukes to "pick that up" from him but wondered if he could "walk it down" (negotiate a lower price).

After the wiretaps ended, FBI agents spoke to Staton about his relationship with Dukes and his involvement in Dukes' drug enterprise. In exchange for Staton's cooperation, the government offered him a limited immunity or proffer agreement, which he signed and accepted on July 12, 2018. Staton then told the agents that Dukes was his childhood friend. Staton said he knew that Dukes had served time in prison on drug charges. After his release, Staton initially did not believe Dukes was selling drugs; however, he grew suspicious based on Dukes' associates. Staton said he did not work drug investigations but would occasionally obtain information about them from Dukes. He claimed that he passed this information to a lieutenant with the DPD, who told him to obtain a sample of fentanyl from Dukes. But, at trial, the lieutenant, Jonathan Parnell, said he never spoke to Staton about Dukes and never asked him to get fentanyl from him as that would be against protocol.

During this same interview, Staton told agents that he had never provided confidential law enforcement information to Dukes because it could jeopardize an investigation or even the safety of an officer. But when confronted with evidence demonstrating that he had done so, he changed his story, claiming that was the "only time."[3] He admitted to dealing some drugs with Dukes and assisting him in other ways, such as running license plate numbers for him and scaring other dealers. Staton also mentioned that Dukes and an associate had asked him to conduct a traffic stop of a vehicle to obtain drugs or drug money, but Staton claimed that he had refused to participate.

---

[3] Staton later admitted to passing along confidential law enforcement information "a handful of times."

After further investigation, agents began to suspect that Staton had been lying. Staton met with the agents for a second time on April 5, 2019. The agents began asking him questions to test his truthfulness. For example, they asked Staton to describe the types of things he did for Dukes; Staton admitted that, while suspended from the DPD, he had on a few occasions brokered small quantities of cocaine for Dukes. The agents were not convinced that a few small drug deals reflected the extent of Staton's service to Dukes. They asked him again whether he had conducted a traffic stop for Dukes; Staton again denied any participation. The agents then told Staton that they had reason to believe he was not being truthful; but, instead of coming clean, Staton stuck to his story. So, the agents scheduled a polygraph examination, which was part of the limited immunity agreement that Staton had signed.[4]

The polygraph never took place, however, because Staton instead agreed to tell the truth at a third proffer session, scheduled for April 12, 2019. There, Staton was remorseful and said he was "done lying." He finally admitted that he had conducted a staged traffic stop at Dukes' request and had received $20,000 in exchange. Staton said he had been in plain clothes and in an unmarked police car when he conducted the stop and was "armed with a pistol." He had asked a friend to come along. The two activated the car's lights and siren, pulled over Sedrick Jackson, a known associate of Dukes, and pretended to arrest him. Staton said that Dukes had asked him to make the stop to scare Dukes' Arizona "drug connection," who was nearby with Dukes watching the stop unfold.

In light of Staton's untruthful proffer statements and his failure to tell the agents about his LEIN checks, the government determined that Staton had breached the terms of the immunity

---

[4] The agreement provided, "At the option of this office, [Staton] will be given a polygraph examination to verify the truthfulness and completeness of any proffer statement."

agreement and decided to bring charges against him. A grand jury charged Staton with one count of conspiring with Dukes and others to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846; and two counts of willfully and knowingly making a materially false statement to a federal agent, in violation 18 U.S.C. § 1001(a)(2).

Before trial, the government moved to admit Staton's proffer statements, arguing that Staton had materially breached the agreement by lying to agents about the staged traffic stop and failing to tell them that he had conducted LEIN searches to determine whether Dukes and his associates were under investigation. The district court granted the government's motion and admitted Staton's statements over his objection.

The case proceeded to trial. After the government rested, Staton made a timely motion for judgment of acquittal, but the district court deferred ruling on the motion until after the jury's verdict. The jury convicted Staton on Count One—conspiracy to distribute and possess with intent to distribute at least 400 grams of a substance containing a detectable amount of fentanyl—but acquitted him on Counts Two and Three—making false statements to federal agents. Staton then filed a written motion for judgment of acquittal or for a new trial. The district court denied the motion.

Before sentencing, Staton objected to the Presentence Investigation Report's scoring of a two-level enhancement under U.S.S.G. § 2D1.1(b)(1) for possessing a firearm during the phony traffic stop he had conducted for Dukes. He argued that there was "no indication that a firearm was possessed or displayed or used." Alternatively, he argued that the enhancement should not be applied because here there was no "increased danger of violence." The court overruled Staton's

objection and imposed a sentence of 216 months' imprisonment, below the Guidelines range of 235 to 293 months. Staton timely appealed.

## II.

Staton first challenges the use of his proffer statements at trial. The government contends that the district court properly admitted the statements because Staton materially breached the immunity agreement by lying and by omitting relevant information about his participation in the conspiracy. By the terms of the agreement, a failure "to provide truthful and complete information on any matter discussed by [Staton] during a proffer session" would result in there being "no restrictions on [the government's] use of [Staton's] proffer statements or information provided by [Staton]." The remedies for breach of an immunity agreement "are those specified in the agreement" itself. *United States v. Fitch*, 964 F.2d 571, 576 (6th Cir. 1992). Accordingly, the only question is whether Staton materially breached the agreement; if he did, the government was free to use his statements at trial.

An immunity agreement is a contract. *Id.* at 574. Therefore, the agreement itself governs the conditions that constitute a breach. *Id.* The government bears the burden of showing a material breach. *Id.* A breach is material if it deprives the government of "the benefit of its bargain." *Id.* at 575.

In the agreement, Staton agreed to provide "truthful and complete" information, to "not . . . omit facts about crimes, other participants, or his . . . knowledge of or involvement in offenses," and to "volunteer all information that is reasonably related to these subjects." The district court determined that Staton breached the agreement in two respects: (1) he lied about performing a traffic stop for Dukes; and (2) he omitted information regarding LEIN checks he conducted for Dukes. The court held that both the lie and omission were "material and substantial"

because the information "would have aided the Government's investigation" by "shed[ding] light on Staton's involvement with Dukes and the organization's operation and sophistication."

On appeal, Staton admits "that he did not tell the government about the traffic stop during the first proffer session," but offers two reasons why this did not breach the proffer agreement. First, he says that his response was truthful because "the Government did not ask him about performing a traffic stop *generally*, but only about performing a traffic stop to seize drugs," which Staton claims he "did not do." (Emphasis added.) But the district court credited FBI Special Agent Michael Fitzgerald's testimony "that Staton was specifically asked about, and denied, performing any sort of traffic stop." We cannot say that finding was clearly erroneous. And, in any event, Staton's obligation under the agreement was not limited to answering the agents' precise questions, narrowly construed. Staton agreed to provide "truthful and complete" information and to "volunteer all information that is reasonably related" to the subjects of the investigation. So even if the agents had asked whether, at Dukes' request, he had performed a staged traffic stop "to seize drugs," Staton should have responded that he had performed such a stop, while explaining that the purpose instead was to frighten one of Dukes' drug connections.

Staton's second argument founders for the same reason. He argues that "there is no evidence that he knew how performing a traffic stop may have assisted[] Dukes."[5] But the scope of the agreement was not limited in this way. And, even if it were, Staton's statements show that

---

[5] Staton also argues that the jury's verdict of not guilty on Count Two—the false-statement charge connected to his lies about the traffic stop—shows that the district court erred. A jury verdict, however, requires certainty beyond a reasonable doubt while the district court's pre-trial decision as to whether to admit these statements was subject to a much lower standard. *See Fitch*, 964 F.2d at 574 (acknowledging that the government's burden of proof to demonstrate that a defendant breached a proffer agreement is governed by either the preponderance-of-the-evidence or adequate-evidence standard). Thus, the court's decision was not inconsistent with the jury's verdict, as Staton argues.

he knew performing a phony traffic stop would assist Dukes' drug organization. At the first proffer session, Staton mentioned that Dukes had asked him to conduct a traffic stop of a vehicle to obtain drugs or drug money, though Staton claimed that he had refused the request. Once he eventually came clean about conducting the phony stop, Staton said that the purpose of the stop was to scare one of Dukes' drug-dealing associates. So, from the first proffer session to the last, Staton knew that his arranging a traffic stop would assist Dukes and his drug organization. The district court did not clearly err when it found that Staton lied about the stop.

The district court also determined that Staton had breached the agreement by omitting information regarding LEIN checks he conducted for Dukes. Staton claims this was not a breach because he "was never asked specifically about the LEIN and [he] was not privy as to what information the Government considered material or simply cumulative." But, again, that argument understates Staton's obligations under the agreement. The agents questioned Staton about running license plates for Dukes, and the district court found that this line of questions "should have alerted Staton that [the agents] would have considered the LEIN checks [for Dukes] to be 'reasonably related' [to] their investigation." We cannot say that the district court erred by finding that Staton omitted "reasonably related" details about the LEIN searches.

Staton's breaches of the agreement were material. The agreement set forth Staton's obligations—tell the truth and volunteer all information that is "reasonably related" to "crimes, other participants, or his . . . knowledge of or involvement in offenses." And it specifically defined those obligations as "material." As a matter of contract law, courts "must ordinarily respect" clear contract terms "making a certain event a material breach of that contract." 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2020). And here the agreement also explained that, in the event of a lie or omission, there would be "no restrictions" on the government's use of the proffer

statements. *See Fitch*, 964 F.2d at 576 ("If a breach of an immunity agreement is established, the available remedies are those specified in the agreement."); *United States v. Reed*, 272 F.3d 950, 955 (7th Cir. 2001) (noting that where proffer agreement "specifically provided for [a] remedy," the government was entitled to that remedy upon breach).

Staton alludes to our decision in *Fitch*, in which we upheld a district court's determination that a breach of an immunity agreement had been immaterial because, despite the breach, the government had still "received the benefit of its bargain." 964 F.2d at 575. We noted in *Fitch* that, despite the defendant's deceptive "effort to minimalize his own involvement" in the crime, he had nonetheless "supplied the government with enough information to allow it to secure a multicount indictment against numerous individuals" and had "assisted the investigation in various other ways." *Id.* Here, by contrast, the district court determined that Staton withheld information that "would have aided the Government's investigation"; that because of his lies and omissions, "Staton's value as a potential witness in other cases was greatly reduced"; and that, in the end, "the Government received nothing of value." Staton does not even suggest any way in which his conduct actually aided the government, despite the breach. The district court did not err in concluding that Staton had materially breached the agreement or by admitting Staton's statements at trial.

### III.

Staton next argues that the district court erred when it denied his motion for judgment of acquittal or for a new trial based on insufficient evidence to prove the conspiracy charge. A defendant mounting such a challenge bears a heavy burden on appeal. *United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007). When reviewing a sufficiency challenge, we must view the evidence in the light most favorable to the prosecution and decide whether "*any* rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When reviewing the denial of a new trial motion on the ground that the verdict was against the clear weight of the evidence, we may not disturb the district court's judgment unless "it was a clear and manifest abuse of discretion." *Id.* at 593.

To sustain a conviction for conspiracy to distribute controlled substances, "the government must prove beyond a reasonable doubt: (1) an agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and (3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007). Staton challenges the second and third elements, arguing that the evidence fails to prove that he "knew the conspiracy's main purpose and voluntarily joined intending to help advance or achieve its goal" or that he "participated in a conspiracy as alleged." "Any conduct," he says, "was prior to the conspiracy or was completely unrelated to any conspiracy." But, again, Staton's arguments fail.

First, the district court properly found that the evidence presented at trial supported the claim that the phony traffic stop took place within the timeframe set forth in the indictment. The indictment alleged that the drug conspiracy occurred "[f]rom an unknown date, but at least as early as 2012, to in or about November 2017." Staton told Agent Fitzgerald that the feigned traffic stop had occurred approximately six years prior and, although Staton did not give an exact date, the agent concluded that the stop occurred either in 2012 or 2013—within the time set forth in the indictment. The evidence at trial was thus consistent with the jury's verdict.

The evidence was also sufficient for any rational trier of fact to find that Staton had knowledge of and intent to join the conspiracy and that he participated in it. "[T]he government must show the willful membership of the defendant in the conspiracy." *Gardner*, 488 F.3d at 711. The knowledge element "is satisfied by proof that the defendant knew the essential object of the

-10-

conspiracy." *United States v. Hernandez*, 31 F.3d 354, 358 (6th Cir. 1994) (quoting *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986)). "[T]he government need not prove that the defendant committed an overt act in furtherance of the conspiracy." *Gardner*, 488 F.3d at 711. The connection between the defendant and the conspiracy "need only be slight," though mere association to conspirators is not enough to satisfy the participation element. *Id.* The defendant's participation "may be inferred from [his] actions and reactions to the circumstances." *Hernandez*, 31 F.3d at 358 (quoting *Christian*, 786 F.2d at 211).

The government presented evidence, which included wiretap recordings of conversations between Staton and Dukes, to satisfy these elements and support the jury's guilty verdict. On the wiretap recordings, Staton and Dukes talked about the fentanyl that they were distributing. These recordings also revealed that Staton assisted his co-conspirators by using a sensitive law enforcement database to search for information and relay it back to other members. Staton told agents that he believed one of the license plate searches concerned an individual bringing in drugs. Furthermore, Staton admitted that he purchased drugs in distribution quantities and conducted a sham traffic stop in order to scare another drug supplier. This admission, along with the other evidence presented, was sufficient for a rational trier of fact to find that Staton conspired to distribute controlled substances. Thus, the district court did not err when it denied Staton's motion for judgment of acquittal. Nor does this case present "the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Hughes*, 505 F.3d at 593 (citation omitted). Accordingly, the court's denial of Staton's new trial motion was not a "clear and manifest abuse of discretion." *Id.* at 594.

IV.

Staton's last argument is that the district court erred by applying a two-level enhancement to his sentence for possessing a firearm during the sham traffic stop.  A defendant's base offense level should be raised two levels if the court finds that he possessed a dangerous weapon during the commission of an offense involving drugs.  U.S.S.G. § 2D1.1(b)(1).  The government must initially prove, by a preponderance of the evidence, that the defendant actually or constructively possessed a weapon during relevant conduct.  *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012).  A presumption then arises that the weapon was connected to the offense.  *Id.*  The defendant may rebut this presumption by demonstrating that "it is clearly improbable that the weapon was connected with the offense."  *Id.* (quoting U.S.S.G. § 2D1.1, cmt. n.3(A) (2011)).[6]  We review a district court's factual determination that a defendant possessed a firearm during a drug crime for clear error.  *United States v. Johnson*, 344 F.3d 562, 565 (6th Cir. 2003).

Staton's argument on appeal is cursory.  He cites *United States v. Blackman*, 625 F. App'x 231, 238 (6th Cir. 2015), and *United States v. Hatcher*, 947 F.3d 383, 395–96 (6th Cir. 2020), for the proposition that a district court may not "rel[y] on supposition and 'mere allegation'" in imposing the two-level enhancement; and he criticizes the government for "ignor[ing] the similarity between the case at bar" and these cases.  But he never explains what similarity he sees.  We see none.

*Hatcher* did not even involve the application of an enhancement under § 2D1.1(b)(1).  *See* 947 F.3d at 395.  Instead, we held that the district court relied on an impermissible sentencing factor by inferring, "based on a complete absence of record evidence," that the defendant had been involved in a prior shooting.  *Id.*  In *Blackman*, we held that the district court erred when it applied

---

[6] This language is now found at U.S.S.G. § 2D1.1, cmt. n.11(A).

the § 2D1.1(b)(1) enhancement because "[o]nly through supposition and 'mere allegation' could the district court" conclude that a cell phone picture of the defendant possessing a firearm, which had been taken in Michigan, days before his illegal acts in Kentucky, "necessarily connected that firearm with the drug-trafficking conspiracy." 625 F. App'x at 237.

Those facts do not remotely resemble Staton's case. Staton admitted to Agent Fitzgerald that he had a "pistol . . . on his person" during the sham traffic stop, which he conducted for Dukes in order to scare Dukes' drug supplier. The district court found Agent Fitzgerald's testimony credible. And Staton offers no evidence to the contrary. The only uncertainty was Staton's recollection as to whether he possessed his service weapon or his personal weapon when he made the stop. The district court did not clearly err when it found that Staton possessed a firearm during the phony traffic stop, and Staton has not shown that "it is clearly improbable that the weapon was connected with the offense." *Greeno*, 679 F.3d at 514 (quoting U.S.S.G. § 2D1.1, cmt. n.3(A) (2011)). The district court did not err by applying the two-level enhancement.

* * *

We AFFIRM the judgment of the district court.