NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0375n.06

No. 15-1175

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jul 05, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| ERIE ADAMS, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE: McKEAGUE and GRIFFIN, Circuit Judges; and BERTELSMAN, District Judge.[*]

PER CURIAM.

Defendant Erie Adams appeals his convictions and sentence for drug trafficking and firearms offenses. Finding no error requiring reversal, we affirm.

I.

This case concerns a conspiracy to distribute heroin. It begins in Winston-Salem, North Carolina, where DEA agents observed and recorded Rudolph Coles and Terrance Poindexter as part of a Title III wiretap investigation. In October 2013, Coles and Poindexter arranged to purchase heroin in Detroit from their contact, Tyrone Conyers. Conyers, a self-described

---

[*]The Honorable William O. Bertelsman, Senior Judge, United States District Court for the Eastern District of Kentucky, sitting by designation.

middleman, called his supplier, "Dog," and arranged to purchase 300 grams of heroin for re-sale to the North Carolina pair.

On October 28, 2013, a tracking device traced Coles' and Poindexter's vehicle to Detroit, where local DEA agents observed Poindexter meet with another vehicle in a parking lot. The second vehicle then drove through a neighborhood and parked at a residence belonging to Conyers. Later that day, Conyers met Poindexter at an apartment complex in Southfield, Michigan. Conyers called Poindexter and invited him inside. After about a minute, Poindexter left the complex and returned to his vehicle. Poindexter and Coles then returned to North Carolina, where local police intercepted them. Police recovered 357 grams of heroin hidden in their vehicle.

Detroit agents later searched Conyers' home, with Conyers present. Conyers waived his *Miranda* rights, and admitted to facilitating the heroin deal. He explained that Poindexter gave him $20,000 at their first meeting, approximately $4,000 of which Conyers kept as his cut. He gave the rest of the money to "Dog" in exchange for the heroin he later provided to Coles and Poindexter at the apartment complex.

Agents located a phone number for "Dog" in Conyers' cell phone. Review of the phone's records led agents to a residence on Ten Mile Road in Roseville, Michigan. The phone's "toll records" confirmed that Conyers used the phone to call "Dog" on the morning of the deal, and received a return call from "Dog" later that day. Subscriber information for the phone number connected it to "John Johnson," at an address in Detroit. An internal DEA database revealed Adams' association with the Detroit address, his former use of the similar alias "Michael Johnson," his involvement in previous DEA investigations, and a prior conviction for conspiracy to distribute cocaine. On November 5, 2013, agents obtained a search warrant for

GPS location information from "Dog's" phone number, which showed multiple "pings" at the Ten Mile Road address over several days. Agents also observed a mini-van registered to Adams parked in the driveway of the house.

Based on these representations, a state court magistrate issued a search warrant for the Ten Mile Road address. DEA agents executed the warrant with a SWAT team the same day. Officers identified and patted Adams down immediately upon entering. They found four cell phones on his person—including one that corresponded to "Dog's" phone number, and listed Conyers' phone number under the name "Ty" in the stored contacts. Defendant disclosed that he kept a gun under a nearby couch, which the agents recovered, along with two other weapons in the master bedroom. Agents also discovered a block of heroin weighing approximately 1.5 kilograms; more heroin divided for distribution; a triple-beam scale; rubber-banded bundles of cash; a hydraulic-operated press; drug cutting agents; an electronic money counter; a counterfeit detection pen; lottery tickets; a ledger containing phone numbers, names, aliases, and dollar amounts; and hydrocodone and oxycodone pills. Following the search, the agents arrested Adams.

While in jail, defendant called an unidentified friend. During the recorded call, defendant referred to Conyers as a "snitch" who "just gave [his] name up" to authorities. He lamented the prospect of serving a lengthy sentence for his "second drug charge," while Conyers was "still out there." Seven days after the phone call, Detroit Police found Conyers dead of gunshot wounds in his still-running vehicle.

Although the government never charged defendant for Conyers' death, law enforcement questioned his involvement. In particular, Adams entered a proffer agreement, promising to divulge what he knew about the narcotics investigation and Conyers' death in exchange for the

government's promise not to use his statements as part of its case-in-chief against him at trial. During his proffer interview, Adams admitted his involvement in heroin and pill distribution, and that he had known Conyers for approximately 30 years, and had helped Conyers sell heroin, including on October 28, 2013. Defendant denied any knowledge of or involvement with Conyers' death.

One significant condition of the proffer agreement, however, was that Adams tell agents the "complete" truth about "matters under the investigation," and pass a polygraph examination; otherwise, there would be "no restrictions" on the government's use of his proffer statements, including use against him at trial. Accordingly, agents again questioned defendant Adams regarding Conyers' murder during a polygraph examination. Adams failed the polygraph. Because of his failure to pass the polygraph, the government notified Adams of its intent to use his statements at trial. Thereafter, the district court denied Adams' motion to exclude the statements.

The government charged and tried defendant on a Second Superseding Indictment including six offenses: (1) conspiracy to distribute heroin; (2)–(4) possession with intent to distribute heroin, oxycodone, and hydrocodone; (5) possession of a firearm in furtherance of drug trafficking; and (6) being a felon in possession of a firearm. After a three-day trial, the jury convicted Adams on all six counts.

Before sentencing, the government filed a motion for an upward departure and upward variance, as well as an information to establish Adams' prior conviction pursuant to 21 U.S.C. § 851. The court's sentence ultimately hewed close to the recommendations in the presentence investigation report ("PSR"): 240 months for Counts 1 and 2, the mandatory minimum, to run

concurrently; 120 months for Counts 3, 4, and 6, concurrent to all other counts; and the mandatory 300 months for Count 5, which must run consecutive to all other counts.

## II.

On appeal, Adams raises six issues. The first five relate to the evidence admitted at trial: (1) the district court's denial of his motion to suppress evidence seized from the Ten Mile Road location, and his request for a *Franks* hearing; (2) Adams' alleged breach of the proffer agreement and the introduction of his proffer statements; (3) the admission of wiretapped co-conspirator statements; (4) the denial of his motion for a mistrial; and (5) the re-opening of proofs after the government rested. For his sixth claim of error, (6), defendant challenges the calculation and enhancement of his sentence. We address each in turn.

## A.

"When reviewing the denial of a motion to suppress, we defer to a district court's findings of fact unless they are clearly erroneous, and we review the court's conclusions of law de novo." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005). "The standard of review for determining the sufficiency of the affidavit," however, "is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (internal quotation marks omitted). The circumstances detailed in the affidavit must indicate why proof of illegal activity will likely be found "in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citation omitted). They should demonstrate, in other words, a "nexus between the place to be searched and the evidence sought." *Id.* (citation omitted).

Adams argues that the required nexus was absent in this case. He contends the affidavit did not contain sufficient evidence of probable cause to search the Ten Mile Road location, and instead only described the North Carolina individuals and their connection to Conyers in broad terms, without linking Adams himself to the conspiracy. Defendant is incorrect. The affidavit included significant evidence of illegal activity at the Ten Mile Road property. Wiretaps, surveillance, and the arrest of the North Carolina men confirmed Conyers' involvement; the search of Conyers' home, and Conyers' own statements, pointed directly to "Dog," and the phone number associated with that alias. Agents corroborated Conyers' tip by verifying that "Dog" was the first person Conyers called after talking to the North Carolina men; that "Dog" had called Conyers back later that day; that "Dog's" phone was subscribed to "John Johnson," a similar name to Adams' prior alias, at a Detroit address associated directly with Adams; that GPS pings of "Dog's" phone number showed the phone located at the house over several days, at all times of day; that Adams was involved in multiple previous DEA investigations, and had a prior conviction for conspiring to distribute cocaine. The magistrate had a substantial basis for concluding that there was a fair probability that contraband or evidence of a crime would be found at the Ten Mile Road location.

To the extent defendant suggests the affidavit was insufficient to connect *him* to the conspiracy, he misunderstands the nexus requirement. A magistrate need not find probable cause that a particular *person* is likely involved in illicit activities; only that a particular *place* is likely to yield contraband. Search warrants "are not directed at persons; they authorize the search of 'places' and the seizure of 'things,' and as a constitutional matter they need not even name the person from whom the things will be seized." *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 (1978) (citation and alteration omitted). "The critical element in a reasonable search is not

that the owner of the property is suspected of a crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Id.* at 556; *see also United States v. Pinson*, 321 F.3d 558, 564–65 (6th Cir. 2003). Here, the affidavit more than adequately demonstrated the "nexus between the place to be searched" (the Ten Mile Road location) and "the evidence sought" (proof of a drug conspiracy). *Carpenter*, 360 F.3d at 594.

Adams' demand for a *Franks* hearing is similarly deficient. "A defendant is entitled to a hearing to challenge the validity of a search warrant if he 'makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and the allegedly false statement is necessary to the finding of probable cause.'" *United States v. Mastromatteo*, 538 F.3d 535, 545 (6th Cir. 2008) (quoting *Franks v. Delaware*, 483 U.S. 154, 155–56 (1978) (alteration omitted)). Adams makes no effort to explain how any statement included in the affidavit was false, let alone that such a statement was made knowingly, intentionally, or with reckless disregard for the truth. He has not made the preliminary showing necessary to justify a *Franks* hearing, and therefore the district court did not err in denying him one. *Id.* at 545–46.

B.

Next, Adams challenges the district court's finding that he breached the proffer agreement. "An agreement not to prosecute is contractual in nature, and subject to contract law standards." *United States v. Fitch*, 964 F.2d 571, 574 (6th Cir. 1992). Interpretation of the agreement is therefore reviewed de novo. *See United States v. Wells*, 211 F.3d 988, 995 (6th Cir. 2000) (addressing plea agreements). The government bears the burden of proving the defendant breached the agreement, and that the breach was "material and substantial," as opposed to "an

inadvertent omission or oversight." *United States v. Darwich*, 574 F. App'x 582, 592 (6th Cir. 2014) (quoting *Fitch*, 964 F.2d at 574). We review the district court's finding of a material breach for clear error. *Fitch*, 964 F.2d at 574.

The proffer agreement in this case is a letter signed by Adams and his counsel, "set[ting] forth all of the terms of th[e] proffer discussion," during which Adams promised to "make a complete and truthful statement of his knowledge of (and role in) the matters under investigation, and to fully and truthfully answer all questions." The letter explains that "omit[ting] facts about crimes, other participants, or his . . . involvement in the offenses" would constitute a breach, and that defendant must "volunteer all information that is reasonably related to the subjects discussed in the debriefing." It further warns that if Adams "fail[ed] to provide truthful and complete information (such as by making a false statement, providing false information, omitting facts or otherwise misleading the government)," or if "the results of the polygraph examination . . . indicate[d] that [he] ha[d] not been truthful," there would be "no restrictions on the government's use of any information provided or statements made" by defendant.

Defendant does not dispute that he failed the polygraph test, or even that he made false statements. Rather, he argues that failing the test in response to questions about Conyers' murder was not a material breach because the homicide "had nothing to do with the narcotics investigation or charges."

"The conditions that will constitute a breach of the immunity agreement are governed by the agreement itself." *Fitch*, 964 F.2d at 574. The agreement here required defendant to provide a complete, "truthful statement of his knowledge of (and role in) the matters under investigation"—not just those with which he was charged. And Conyers' death was a significant "matter[] under investigation." Conyers was a critical part of the alleged conspiracy, acting as a

long-time "middleman" and point of contact with out-of-state dealers, and the key witness implicating Adams. His death also appears to have been investigated as a murder from the start. We have drawn a distinction between defendants who, despite misstatements, still "suppl[y] the government with enough information to . . . secure a multicount indictment against numerous individuals," *id.* at 575, and those whose misrepresentations "hinder the prosecution of other individuals," thereby materially breaching their agreements. *McKissic v. Birkett*, 200 F. App'x 463, 469 (6th Cir. 2006) (following *United States v. Reed*, 272 F.3d 950 (7th Cir. 2001)). As the district court found, this case involves the latter: "Tyrone Conyers'[] homicide . . . was central to the Government's investigation because it related to a larger drug trafficking scheme and investigation. Because Defendant lied, he cannot be summoned as a potential witness in other cases, and the Government has garnered no leads from Defendant in furtherance of their investigation." Thus, the district court did not err in finding Adams breached the proffer agreement.

## C.

In addition to the proffer interview statements, the government introduced—over Adams' objection—wiretap recordings between Coles and Poindexter and Conyers setting up the drug exchange and referring to the heroin seized in North Carolina. Defendant contends the district court abused its discretion in admitting this evidence.

To admit an out-of-court statement under Federal Rule of Evidence 801(d)(2)(E), the offering party "must establish by a preponderance of the evidence that a conspiracy existed, that the defendant was a member of the conspiracy, and that the coconspirator's statement was made during the course and in furtherance of the conspiracy." *United States v. Kelsor*, 665 F.3d 684, 693 (6th Cir. 2011). The trial court may admit the statements conditionally, but if the

government ultimately fails to establish the proper foundation, the court should issue cautionary instructions or, if necessary, grant a mistrial. *Id.*

Defendant dismisses the government's evidence of his involvement in the conspiracy as "very bare bones." We disagree. Defendant's own proffer statements established his connection to Conyers, their plan to distribute and re-sell the drugs in order to increase their profits, including the planned sale to the North Carolina individuals. Conyers' calls to Coles and Poindexter, exchanging phone numbers, explaining where to meet, and when Poindexter should come to the door to pick up the heroin, were made in furtherance of the drug purchase. Trial testimony and call records demonstrated that Adams and Conyers had each other's phone numbers, and called one another on the day of the narcotics deal.

Adams is incorrect in his assertion that he could not have conspired with Coles and Poindexter because he did not know them. "Drug conspiracies are often 'chain' conspiracies which normally involve numerous sales and resales of drugs until they reach the ultimate consumers." *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008) (citation omitted). "[E]ach member of the conspiracy must realize that he is participating in a joint enterprise," but he need "not know the identities of many of the participants." *Id.* (quotation omitted). "A single conspiracy is not converted to multiple conspiracies . . . simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v. Beals*, 698 F.3d 248, 259 (6th Cir. 2012) (internal quotations omitted).

Here, the record includes significant evidence tying defendant to the conspiracy. For this reason, the district court did not abuse its discretion in admitting the wiretap statements.

D.

Next, defendant claims that the district court committed reversible error by denying his motion for a mistrial after homicide detective Moises Jiminez referred to Conyers' death during his trial testimony. This court reviews the denial of a motion for a mistrial for abuse of discretion. *United States v. Fields*, 763 F.3d 443, 462 (6th Cir. 2014).

Before trial, the government agreed not to present evidence "that Tyrone Conyers was shot and killed or that defendant may be a suspect." It called homicide detective Jiminez to testify about Adams' admission to selling Conyers heroin during the proffer interview. On cross-examination, however, the following exchange between Jiminez and defense counsel occurred in the presence of the jury:

> Q: Okay. Now, in reviewing [your] notes, does it refresh your recollection as to whether or not Mr. Adams allegedly said during the debriefing that he didn't have any customers?
>
> A: It still doesn't, because I wasn't there for the dope thing. I'm there for the homicide thing. Mr. Tyrone Conyers is dead.

Defendant's counsel immediately moved for a mistrial. The trial court denied the motion, and instead issued a curative instruction. Adams claims this instruction was insufficient to curb potential prejudice and reversal is required. We disagree.

In the case of an improper witness statement, we consider five factors to determine whether a mistrial is warranted:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether a limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003). The "primary concern" of the inquiry "is fairness to the defendant." *United States v. Forrest*, 17 F.3d 916, 919 (6th Cir. 1994) (per curiam).

In the present case, none of the five factors weighs in favor of a mistrial. Detective Jimenez's remark was both (1) unsolicited and (2) not a part of the government's questioning at all, as it occurred during cross-examination. The remark was (3) followed by an immediate, clear, and forceful limiting instruction. It was (4) unaccompanied by any evidence of bad faith on the government's part, and (5) comprised only one short sentence in the midst of three days' worth of evidence against Adams. *See United States v. Hayes*, 399 F. App'x 57, 59–60 (6th Cir. 2010) (unsolicited statement by witness that she was afraid of the defendant's family waiting outside the courtroom did not merit mistrial, since it was unrelated to any government questioning, a minor part of the testimony at trial, and was followed by an immediate, clear, and forceful curative instruction); *United States v. Ramseur*, 378 F. App'x 260, 264 (4th Cir. 2010) (no prejudice caused by mention of a "murder charge," since it did "not provide any insight into who was charged with a murder").

In particular, the trial court's limiting instruction, given shortly after Jimenez's statement, made clear that the jury was not to consider the fact of Conyers' death, while still taking pains to avoid any implication that Adams was himself involved:

> Members of the jury, you have heard testimony that Mr. Conyers is dead. You are not to consider the fact that he is dead at all in your consideration of the evidence received in this case. It cannot factor at all in your deliberations.

The district court further required each juror individually to verbally "commit to following [its] instruction."

Defendant makes much of the fact that the government presented "a homicide detective to testify against" him, which he believes "demonstrates bad faith." Adams forgets that the government disclosed its intent to call a homicide detective before trial, and that his counsel confirmed this was "agreeable" to the defense. Moreover, defendant cites no evidence to dispute the government's representation at trial that it instructed its witnesses to refrain from mentioning Conyers' death. And defendant has no proof of bad faith. For these reasons, we conclude that the district court did not abuse its discretion in denying defendant's motion for a mistrial.

E.

At the close of its case-in-chief, the government failed to read to the jury the joint stipulation reached with defendant regarding his status as a convicted felon. Count Six charged Adams with being a felon in possession of a firearm, and Adams agreed to stipulate to the jury that he had been "convicted of a felony offense, that is, an offense punishable by one year or more." *See* 18 U.S.C. § 922(g)(1). The government rested without reading the stipulation. Defendant moved for a directed verdict, but the court was concerned that the failure was "inadvertent," and, after argument, agreed to the government's request to re-open its proofs to read the stipulation to the jury. Defendant claims this was an error requiring reversal.

In order to secure a reopening, the moving party must show that the evidence to be presented is "relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused." *United States v. Reid*, 357 F.3d 574, 581 n.7 (6th Cir. 2004) (citation omitted). The district court "must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion," but "[t]he most important consideration is whether the opposing party is prejudiced by reopening." *United*

*States v. Blankenship*, 775 F.2d 735, 741 (6th Cir. 1985) (quotation omitted). We review the decision to reopen proofs for abuse of discretion. *Id.*

We find no abuse here. All three factors of the *Blankenship* test weigh in favor of re-opening proofs: the motion to reopen was timely and prior to submission of the case to the jury; the evidence, presented in the sterile form of a stipulation, was as non-prejudicial as is possible, and was the uncontested "truth"; and although the effect of granting the motion surely hurt Adams, it cannot be deemed "undu[ly] "prejudic[ial]." *Fields*, 763 F.3d at 465. As the district court recognized, admission of the stipulation here "comport[ed] with the parties' intentions and expectations." "Reopening is often permitted to supply some technical requirement . . . or to supply some detail overlooked by inadvertence." *Blankenship*, 775 F.2d at 740. "Where . . . reopening is permitted after the government has rested its case in chief, but before the defendant has presented any evidence, it is unlikely that prejudice sufficient to establish an abuse of discretion can be established." *Id.* at 741. Adams has failed to make that showing.

F.

Finally, defendant raises several sentencing issues. This court reviews legal decisions and "mixed questions of law and fact" involving application of the Sentencing Guidelines de novo, and the district court's factual determinations in connection with sentencing for clear error. *United States v. Stafford*, 721 F.3d 380, 400 (6th Cir. 2013) (quotation omitted).

Defendant first contends that the PSR improperly calculated the quantity of heroin involved in the conspiracy. The government concedes as much: Adams should have been cited for possessing between 1 and 3 kilograms of heroin, not 3.8 kilograms, and his base offense level accordingly should have been calculated to be 30, with a total offense level of 32, not 32 adjusted to 34. This court need not remand for resentencing, however, where an error in

calculating the Guidelines range "had no effect," since the defendant was sentenced to the statutory mandatory minimum. *United States v. Barnes*, 49 F.3d 1144, 1150 (6th Cir. 1995) ("When the maximum Guideline sentence is less than the statutorily required mandatory minimum, the latter is the effective sentence."); *see also United States v. Mitchell*, 398 F. App'x 159, 164 (6th Cir. 2010) (concluding that remand was unwarranted, since the mandatory minimum sentence was imposed, and thus "remand for resentencing would not result in a shorter sentence."). Remand is likewise not warranted in this case because the error "had no effect" on Adams' mandatory sentence. *Barnes*, 49 F.3d at 1150.

Defendant also claims that the government should not have been permitted to file an information enhancing his minimum sentence under 21 U.S.C. § 851. The government filed its information roughly two weeks ahead of trial. As a result, Adams faced an enhanced, twenty-year minimum penalty on Counts One and Two of the Second Superseding Indictment. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i); 21 U.S.C. § 846. At sentencing, the district court recognized this enhanced minimum sentence and imposed it as required.

"Section 851 provides that increases in sentences based upon prior felony drug convictions may not be imposed unless the United States Attorney has filed an information stating the previous convictions to be relied upon." *United States v. Crayton*, 357 F.3d 560, 571 (6th Cir. 2004) (citing 21 U.S.C. § 851(a)). While the government here recited Adams' past conviction for conspiring to distribute cocaine as the basis for an enhanced sentence, defendant counters that it unfairly relied on prior uncharged crimes, including the murder of Conyers, to justify the increased punishment.

In *Crayton*, this court considered, and rejected, a similar claim regarding the alleged "punitive[]" use of § 851. *Id.* at 571–72; *see also United States v. Neal*, 577 F. App'x 434, 451

(6th Cir. 2014). *Crayton* explained that "[t]he discretion a prosecutor exercises in determining whether an enhanced statutory maximum applies under § 851 is similar to the initial discretion the prosecutor has in deciding which charges to bring against a defendant, discretion that is obviously constitutional." 357 F.3d at 572. "Such discretion is an integral feature of the criminal justice system, and is appropriate, so long as it is not based upon improper factors." *United States v. LaBonte*, 520 U.S. 751, 762 (1997). Improper factors may include "race, religion, or other arbitrary classification," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quotation omitted), or the "exercise of protected statutory and constitutional rights," *Wayte v. United States*, 470 U.S. 598, 608 (1985).

Defendant identifies no improper considerations here. His suggestion that the district court sentenced him as "a de facto career criminal" is also belied by the record. The district court specifically *denied* the government's request to vary upward to the career-offender Guidelines range. Adams' sentencing challenges are without merit.

### III.

For the foregoing reasons, we affirm defendant's convictions and sentence.