Filed 7/29/21

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B299687 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA396138) |
| v. | |
| JORGE PALACIOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Larry P. Fidler, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\*       Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication of all sections except sections II, III and IV of the Discussion.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr. and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Prior to being charged with ordering the kidnapping, rape and killing of a 13-year-old girl, defendant Jorge Palacios (defendant) made inconsistent statements to law enforcement—at first denying he ever saw the victim, but later admitting that he saw her just before she went missing and in the company of the gang members who kidnapped, raped and killed her. Defendant made these statements pursuant to a proffer agreement with prosecutors, wherein they agreed not to use "any statements made" during the proffer session in any future case-in-chief as long as defendant was "completely truthful and candid" during the proffer session.

This appeal presents the question: Must the prosecutorial agency that seeks to use these internally inconsistent (and hence untruthful) statements first demonstrate that it has "standing" to enforce the proffer agreement? We conclude that the answer is "no" because standing is necessary when a party seeks affirmative relief from a contract, but here it is *defendant*—not the prosecutors—who is seeking specific performance of the proffer agreement's promise of inadmissibility, and hence *defendant* who must establish that he met the agreement's condition precedent of truthfulness. This holding differs in some respects from prior cases that have seemingly treated a defendant's untruthfulness as a breach of contract to be established by prosecutors. (See, e.g., *People v. Collins* (1996) 45

2

Cal.App.4th 849, 870 (*Collins*); *United States v. Adams* (6th Cir. 2016) 655 Fed. Appx. 312, 317-319 (*Adams*); *Wilson v. Washington* (7th Cir. 1998) 138 F.3d 647, 652-653 (*Wilson*).)

We agree with the trial court that defendant's statements were properly admitted because he failed to establish the truthfulness of his proffered statements. In the unpublished portion of this opinion, we reject defendant's further arguments that a key witness was an accomplice as a matter of law and that defendant is entitled to remand for the trial court to exercise its sentencing discretion. Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

In early May 2001, 13-year-old Jacqueline P. (Jacqueline) ran away from home.

Late in the afternoon of June 27, 2001, Jacqueline encountered defendant. It was an encounter that would change—and end—her life.

Defendant belonged to the Francis clique of the MS-13 street gang, and was selling drugs at the intersection of 8th Street and Magnolia Avenue in the MacArthur Park neighborhood of Los Angeles, California. Defendant labeled Jacqueline a "chavala"—that is, a trespasser from another gang's "hood." It was a gang's obligation to punish any chavala who set foot into its territory.

Acting on defendant's belief, defendant and his girlfriend punched Jacqueline, pulled her hair, threw her to the ground and proceeded to kick her. Two other MS-13 gang members from the Park View clique—Melvin Sandoval (Sandoval) and Santos Grimaldi (Grimaldi)—walked up. So did Alicia Montano (Alicia),

3

who belonged to an all-female clique of MS-13.[1] Defendant asked Alicia to join them in beating Jacqueline, but she declined.

Defendant then told Sandoval and Grimaldi that they should take Jacqueline somewhere else, have sex with her, and then "get rid of her."

Moments later, MS-13 gang member Rogelio Contreras (Contreras) pulled up in a white car. Defendant asked Contreras if he could supply a ride to "do a job." Contreras agreed.

Alicia took Jacqueline, whose hair was mussed and face was red from the beating, to her sister Ana Montano's (Ana's) nearby apartment to freshen up.

Minutes later and as twilight fell, Contreras pulled up in a red car. Fearing that defendant might be upset with her for not obeying his command to beat Jacqueline, Alicia invited Ana's boyfriend to come along to protect her.

Sandoval, Grimaldi, Alicia, and Ana's boyfriend got into Contreras's car with Jacqueline. Defendant and his girlfriend stayed behind because the car was full and because defendant feared he may have been seen with Jacqueline earlier that day.

They set off for Elysian Park, with Jacqueline quietly sobbing in the back seat. Midtransit, they stopped under a freeway underpass and Grimaldi ordered Jacqueline into the car's trunk so roadway cameras would not be able to document her as a passenger.

They arrived at Elysian Park after nightfall. Grimaldi and Sandoval took Jacqueline with them to a secluded hillside, with Grimaldi insisting that he wanted to "be the first one with her."

---

[1] Because Alicia Montano's sister is also a witness and shares the same last name, we will use the sisters' first names for clarity. We mean no disrespect.

After both men had sex with Jacqueline, Grimaldi retrieved Alicia and dragged her, by her hair, to the hillside. Jacqueline was naked except for her shoes and socks, her knees folded up against her chest, sobbing quietly. Her soiled panties were nearby, her loss of bowel control consistent with being in abject terror. Sandoval was armed, and had a gun pointed at Jacqueline.

Grimaldi then pulled out a gun, and put it in Alicia's hands. He told her to shoot Jacqueline; Alicia refused. Grimaldi then reached around Alicia from behind, and aimed the gun at Jacqueline. Grimaldi and Alicia struggled, as Grimaldi tried to get Alicia to pull the trigger, but Alicia kept her hands solely on the gun's grip. Grimaldi then pulled the trigger once, then a second time. Both bullets hit Jacqueline in the head. She died instantly. To ensure that Alicia would take any blame and fallout for shooting a 13-year-old who might not have been a "chavala," Grimaldi told everyone that Alicia had pulled the trigger.

Everyone piled back into Contreras's car, abandoning Jacqueline's naked body all alone in the dark.

## II.    Procedural Background

### A.    *Charges*

A grand jury returned an indictment charging defendant, Grimaldi, Sandoval and Contreras (collectively, the defendants) with (1) murder (Pen. Code, § 187, subd. (a)), and (2) kidnapping to commit the crimes of rape and of committing a lewd or lascivious act on a child (*id.*, § 209, subd. (b)(1)).[2] As to the

---

[2]    The grand jury also charged Sandoval with the substantive crime of committing a lewd act upon a child under the age of 14 (§ 288, subd. (a)).

5

murder count, the grand jury further alleged, as a special circumstance, that the murder occurred while the defendants were engaged in the crimes of kidnapping, rape, and commission of a lewd or lascivious act upon a minor (§ 190.2, subd. (a)(17)). The grand jury additionally alleged that both the murder and kidnapping were committed "for the benefit of, at the direction of, and in association with a criminal street gang" (§ 186.22, subd. (b)(1)(C)), that Sandoval and Grimaldi had personally discharged a firearm causing death (§ 12022.53, subd. (d)), and that a "principal" in these gang-related crimes had personally discharged a firearm causing death (*id.*, subds. (d) & (e)(1)).

### B. *Trial*

The matter proceeded to a five-month jury trial before two juries, with defendant having a separate jury from the other defendants. The People sought the death penalty against Grimaldi and Sandoval, but not defendant or Contreras. A jury found defendant guilty of both crimes and found true both the special circumstance as well as all of the alleged enhancements.

### C. *Sentencing*

The trial court sentenced defendant to two life terms plus 50 years to life. Specifically, the court imposed a sentence of life in prison without the possibility of parole for the murder, plus 25 years to life for the firearm enhancement. The court stayed the gang enhancement because he was "required to do so." The court then imposed a prison sentence of life plus an additional 25 years to life for the firearm enhancement; once again, the court stayed the gang enhancement. The court ran the two life sentences consecutively.

---

All further statutory references are to the Penal Code unless otherwise indicated.

**D.** *Appeal*

Defendant filed this timely appeal.

## DISCUSSION

On appeal, defendant argues that the trial court erred in (1) admitting into evidence statements defendant made during a multiday proffer session with the United States Attorney's Office (U.S. Attorney's Office) in June and July 2010, (2) not instructing the jury that Alicia was an accomplice as a matter of law, which mandates reversal of his convictions because her testimony lacks any corroboration, (3) ignoring the cumulative effect of these errors, and (4) not recognizing and exercising its newly conferred discretion to dismiss the firearm enhancements.

## I. Admissibility of Defendant's Statements from Proffer Session

Defendant argues that the trial court violated the law as well as his due process rights in allowing the People to introduce statements he made during a multiday proffer session; the People introduced them to show defendant's inconsistent stories and hence his consciousness of guilt. Specifically, defendant asserts that (1) admission of his statements are barred by a proffer agreement and the People lack standing to argue otherwise, and (2) the People have "unclean hands."

### A. *The proffer agreement as a basis for exclusion*

#### 1. *Pertinent facts*

##### a. The multiday proffer session

Defendant and his attorney met with a federal prosecutor, two Federal Bureau of Investigations (FBI) agents, and one (and sometimes two) Los Angeles Police Department (LAPD) detectives who were serving on a federal task force during four days in June and July 2010.

7

The proffer session was covered by a written proffer agreement (proffer agreement) signed by the federal prosecutor, defendant and his lawyer. In the proffer agreement, defendant promised to respond "truthfully and completely to any and all questions" posed, and the U.S. Attorney's Office promised "not" to "offer in[to] evidence in its case-in-chief . . . any statements made by" defendant during the proffer session. The proffer agreement specified that defendant's "complete truthfulness and candor are express material conditions to the undertakings of [the U.S. Attorney's] Office set forth in this letter," such that the U.S. Attorney's Office could use defendant's statements "for any purpose" if it "concludes" that defendant was "not . . . completely truthful and candid" and "notif[ies]" defendant before "making use of such statements." The U.S. Attorney's Office also "reserve[d] the right to use any" of defendant's statements to impeach defendant on cross-examination or "in any prosecution for false statements, obstruction of justice or perjury."

Although the proffer agreement provided that it "does not bind any other law enforcement or prosecuting authority," the federal prosecutor and defendant's attorney orally agreed that the proffer agreement applied to the LAPD-based task force members present during the session.

On the second and third days of the proffer, defendant denied ever having seen Jacqueline and said he did not recognize her in photographs he was shown. On the fourth day of the proffer, defendant initially stuck to his prior denials. However, defendant then changed his story and acknowledged that he *had* seen Jacqueline and recognized her in a photograph; that Jacqueline had been "talking to [MS-13's] enemies"; that he had seen her once at the intersection of 8th and Magnolia; and that

he had also seen her riding in a car with Grimaldi, Sandoval, Contreras and Alicia.

>  b.  Litigating the proffer statements in this case

In September 2016, October 2017 and December 2017, the People filed motions in limine seeking a ruling allowing them to admit the above-delineated statements from defendant's proffer session. Following fulsome briefing, the trial court made two rulings.

First, the court referred to a different judge the question of whether the proffer agreement entered into by federal prosecutors also applied to the People. That judge ruled that the oral agreement between the federal prosecutor and defendant's attorney constituted a "side agreement" to apply the "written [proffer] agreement" to the LAPD and, by extension, to the People.

Second, the trial court found, "by clear and convincing evidence[,] that [defendant had] lied during the proffer session" because defendant's final statement during the proffer session was wholly inconsistent with his initial statements and because defendant admitted to police in May 2011 that he "had lied . . . about that girl" and "knew who that girl" was. Based on its finding that defendant had not been truthful during the proffer session, the court alternatively ruled that (1) defendant had "breach[ed] . . . the agreement," and (2) defendant's untruthfulness meant "there is no agreement" and that the "[t]he agreement was null and void."

>  2.  *Analysis*

Proffer agreements are a type of contract. As such, they "'may be analyzed in terms of contract standards,'" although

9

"courts will not 'follow blindly the law of contracts' where that body of law does 'not provide a sufficient analogy and mode of analysis.'" (*People v. C.S.A.* (2010) 181 Cal.App.4th 773, 778-779 (*C.S.A.*), quoting *United States v. Carrillo* (9th Cir. 1983) 709 F.2d 35, 36-37 & fn. 1.) Although we independently review the plain text of agreements (*Gribaldo v. Agrippina Verischerunges A.G.* (1970) 3 Cal.3d 434, 445-446), we review for substantial evidence whether "the parties entered into an agreement," whether the plain text of the agreement was modified or defined by conflicting extrinsic evidence, and "whether a party carried through with its part of the agreement." (*C.S.A.*, at pp. 777-778; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866.)

The trial court correctly ruled that the People could introduce defendant's statements from the proffer session during its case-in-chief. It is undisputed that those statements are relevant, properly authenticated, and not barred by the hearsay rule due to the adverse party admissions exception (Evid. Code, § 1220). Thus, the sole potential bar to their admission is the proffer agreement—as extended to the People through the "side agreement." In this respect, *defendant* is seeking to specifically enforce the proffer agreement's provision that the U.S. Attorney's Office—and, through the "side agreement's" extension, the People—are "not" to "offer in[to] evidence in its case-in-chief" the statements defendant made during the proffer session. (*C.S.A.*, *supra*, 181 Cal.App.4th at p. 779 [defendant seeking to exclude evidence by virtue of proffer agreement is "seek[ing] specifically to enforce a promise"]; *People v. Perez* (2016) 243 Cal.App.4th 863, 879 [same]; accord, *Santobello v. New York* (1971) 404 U.S.

10

257, 263 [defendant may seek "specific performance" of a plea agreement].)

It is well settled, however, that a party to a contract "may not obtain specific performance unless he has performed . . . all of the conditions precedent required of him by the terms of the contract." (*Evarts v. Johnston* (1949) 34 Cal.2d 6, 9; *Realmuto v. Gagnard* (2003) 110 Cal.App.4th 193, 204; Civ. Code, § 3392 ["Specific performance cannot be enforced in favor of a party who has not fully and fairly performed all the conditions precedent on his part . . ."].) Because, under the proffer agreement in this case, defendant's "complete truthfulness and candor are express material conditions" of the U.S. Attorney's Office's—and, through the side agreement's extension, the People's—promise not to use defendant's proffered statements in their case in chief, defendant's truthfulness during the proffer session was a condition precedent to his right to enforce the People's promise. (Cf. *People v. Quartermain* (1997) 16 Cal.4th 600, 617-618 [dealing with proffer agreement where "the parties did not condition the prohibition [of use of proffered statements in the future] on the truthfulness of defendant's statement"].)

Substantial evidence supports the trial court's finding that defendant did not satisfy the condition precedent of being truthful. Defendant's own statements confirm his lack of truthfulness during the proffer. Defendant's initial statements during the proffer that he had never seen Jacqueline before in his life are irreconcilable with (1) his statements on the last day of the proffer session that he recognized Jacqueline, and had seen her once just before she disappeared and in the company of the people who drove her to the park, and (2) his subsequent admission to other law enforcement officers that he "knew who

11

that girl was" and "had [previously] lied" about not knowing her. In light of these statements and admissions, we disagree with defendant's assertion that "[t]here is no way of knowing" that he lied about not knowing Jacqueline.

Defendant resists this conclusion with what boil down to five arguments.

First and foremost, defendant argues that the People lack standing to prevent him from invoking the proffer agreement. This argument rests on two premises:  (1) the People are obligated to prove that he breached the proffer agreement, and thus must have standing to do so (e.g., *Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 992-993 ["[t]he parties to [a] contract in essence create a mini-universe for themselves"]), and (2) the People lack standing here because they are not parties to or intended beneficiaries of the proffer agreement.

Neither premise is valid.

Although prior cases have examined whether prosecutors may use a defendant's statements made under the auspices of a proffer agreement by asking whether there was a breach of the agreement (*Collins*, *supra*, 45 Cal.App.4th at p. 870; *Adams*, *supra*, 655 Fed. Appx. at p. 317-319; *Wilson*, *supra*, 138 F.3d at pp. 652-653), this is in our view not the proper analytical path to walk.  A party to a contract must prove a breach of that contract only when that party is seeking to obtain relief—typically, damages or specific performance—based on that contract.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 [plaintiff seeking to recover on a contract must prove a contract, breach, causation and damages]; *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 905 [remedies for breach of contract include "damages" and "specific performance"]; *Rogers v. Davis* (1994) 28

12

Cal.App.4th 1215, 1218, fn. 2, 1220 [same].) Here, the People are not seeking damages or specific performance of the proffer agreement; instead, the People's motion in limine was designed to alert the defendant (as required by the proffer agreement, as applied to them through the side agreement) and the trial court (as counseled by wise pretrial procedure) to the People's intention to use defendant's proffered statements because defendant did not satisfy the condition precedent to the agreement's continued validity. That the trial court only partially relied on the failure-of-condition-precedent rationale—and also partially relied on a breach-based rationale—is of no moment because our task is to review the court's ruling, not its rationale.[3] (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12 ["'we review the ruling, not the court's reasoning' [citation]"].) For these reasons, the People are not required to establish standing.

But even if they were, the People have established standing. The trial court held that there was an oral side agreement that made the "written [proffer] agreement" applicable to the LAPD and, by necessary implication, to the People. (After all, if the proffer agreement did not apply to the

_____

[3] The trial court's reference to the proffer agreement being "void" and there being "no agreement" are also of no moment. Defendant contends that there is no such thing as a "void contract" and that an agreement is unenforceable only if it meets the definition of illegality set forth in Civil Code section 1667. We need not consider these contentions because the trial court's language can also be read as supporting what we believe to be the proper rationale—namely, that defendant's failure to be truthful was a failure of a condition precedent that prevents him from specifically enforcing the contract, thereby effectively voiding it and leaving no agreement to enforce.

People through the side agreement, there would have been no need to litigate whether defendant had been truthful.) Because the side agreement created an agreement between defendant and the People identical to the proffer agreement between defendant and the U.S. Attorney's Office, the People necessarily had standing to assert a breach of the side agreement. (*Kanno v. Marwit Capital Partners II, L.P.* (2017) 18 Cal.App.5th 987, 1019 ["'[I]t goes without saying that a party to a contract . . . may bring actions related to such contracts'"]; cf. *Cooper v. Pena* (1863) 21 Cal. 403, 410-411 [when an agreement "cannot be specifically enforced as to one of the parties, equity will not enforce it against the other"]; see generally, Code Civ. Proc., § 367.)

Second, defendant argues that, under the plain text of the proffer agreement, only the U.S. Attorney's Office can "conclude" that defendant was "not . . . completely truthful and candid," and the U.S. Attorney's Office has yet to assert its contractual rights under the proffer agreement or to conclude defendant was untruthful during his June and July 2010 proffer, such that there is no conclusion by the U.S. Attorney's Office and, possibly, that the Office may have waived its right to object to defendant's untruthfulness. As a threshold matter, we note that substantial (and, indeed, overwhelming) evidence supports the trial court's finding that defendant *was* untruthful and also that one of the FBI agents on the last day of the proffer informed defendant of his belief that defendant had been untruthful. Even if there was some dispute, defendant's argument lacks merit for many reasons in any event. To begin, it is the trial court's job to assess whether defendant carried his burden of showing that he was truthful, which, as noted above, was a condition precedent for specifically enforcing the proffer agreement. (E.g., *Phoenix Ins. Co. v. Sukut*

14

*Construction Co.* (1982) 136 Cal.App.3d 673, 677; *Paratore v. Scharetg* (1942) 53 Cal.App.2d 710, 714-715.) The judge who determined whether there was a side agreement in this case recognized as much. Moreover, the side agreement effectively put the People in the proverbial shoes of U.S. Attorney's Office vis-à-vis the proffer agreement: If the proffer agreement precluded the People—like the U.S. Attorney's Office—from introducing statements in its case in chief, then the agreement empowered the People—like the U.S. Attorney's Office—to determine whether defendant was being truthful during the proffer session. Defendant offers no support for his implicit assertion that the side agreement incorporated some, but not all, provisions of the proffer agreement. What is more, defendant's selective incorporation argument would lead to a nonsensical outcome— namely, that the proffer agreement (despite its plain language to the contrary) would preclude *every* prosecutorial authority who is not a party to the agreement from using *any and all* of defendant's proffered statements unless and until the U.S. Attorney's Office intervened to declare its determination that defendant had been untruthful during the proffer, even in cases—such as this one—where it is overwhelmingly established that defendant *was* untruthful.

Third, defendant argues that, under the terms of the proffer agreement, the People's sole remedy for his untruthfulness is to prosecute him for making "false statements, obstruction of justice or perjury." This would make the proffer agreement operate like use and derivative immunity, for which the exclusive remedy for untruthfulness is a prosecution for perjury. (*Kastigar v. United States* (1974) 406 U.S. 441, 448-449, quoting 18 U.S.C. § 6002.) This argument rests on a misreading

15

of the proffer agreement, which explicitly provides that a prosecution for false statements, obstruction of justice or perjury is one of three exceptions to the bar to the use of his statements during the prosecution's case-in-chief; another exception is when the defendant's failure to be truthful enables the prosecution to "use" the proffered statements "for any purpose." There is also no reason to equate the proffer agreement with use and derivative use immunity: The former is a voluntary and conditional immunity premised, at least in this case, on the truthfulness of defendant's statements (*Collins*, *supra*, 45 Cal.App.4th at p. 869), while the latter is an involuntarily imposed immunity that overcomes a person's privilege against self-incrimination regardless of whether the immunized testimony is truthful. There is no basis for reading the narrow exception to the latter as the sole exception to the former.

Fourth, defendant argues that his proffered statements are involuntary—and hence inadmissible—because they were premised on the promise of immunity conferred by the proffer agreement. (See, e.g., *Perez*, *supra*, 243 Cal.App.4th at pp. 866-867.) This argument ignores that the immunity promised was *conditioned* on his truthfulness. Because defendant necessarily knew he was being untruthful at the time he made his proffered statements, he had no basis to rely upon a conditional promise of immunity that he knew he was not satisfying; his statements were not involuntary.

Lastly, defendant argues that the trial court erred in allowing one of the FBI special agents who attended the proffer sessions to testify before the jury that defendant had been untruthful when he initially denied knowing Jacqueline during the proffer session. Although it is error for one witness to offer

16

an opinion on the truthfulness of another witness (e.g., *People v. Sergill* (1982) 138 Cal.App.3d 34, 39; *People v. Smith* (1989) 214 Cal.App.3d 904, 915; *United States v. Sanchez* (9th Cir. 1999) 176 F.3d 1214, 1219-1220), that maxim does not provide a basis for relief here. To begin, defendant did not raise this argument until his reply brief on appeal, and thus waived it. (E.g., *Hibernia Sav. & Loan Soc. v. Farnham* (1908) 153 Cal. 578, 584.) The record also refutes the factual premise of defendant's argument because the trial court never allowed the FBI agent to testify that he believed defendant's initial statements to be untruthful for the purpose of establishing that they were, in fact, untruthful. The FBI agent testified that he "wasn't satisfied" with defendant's statements denying knowledge of Jacqueline on the second and third days of the proffer, but when the agent testified to not believing defendant's denial of knowledge on the fourth day, the trial court on all but one occasion instructed the jury to consider the statement only for the purpose of explaining why the agent kept pressing defendant and not "for [its] truth." There was no prejudice in any event because defendant later admitted that he had lied during the proffer; whether the FBI agent had been correct in intuiting the same could not have been prejudicial.

### B.     *Unclean hands a basis for exclusion*

"[T]he equitable doctrine of unclean hands applies when a plaintiff has acted unconscionably, in bad faith, or inequitably in the matter in which the plaintiff seeks relief." (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 432.) Defendant urges that the People have unclean hands because (1) the federal prosecutor or FBI agents wrongfully gave the LAPD and the People copies of defendant's proffer statements, and (2) the People wrongfully

17

took advantage of the federal officers' intransigence by seeking to admit those statements in the trial in this case.

Defendant's unclean hands argument lacks merit for two reasons. First, the doctrine applies to bar *plaintiffs* from seeking relief, but the People—albeit a plaintiff in the overall prosecution—were not seeking relief under the proffer agreement. Instead, as explained above, it was *defendant* who was seeking to specifically enforce the proffer agreement. Thus, the doctrine does not apply. Second, even if the doctrine applied, it is not satisfied because the People did not act unconscionably, in bad faith or inequitably in trying to use defendant's proffer statements in its case-in-chief. As we hold, defendant did not satisfy the condition precedent required by the proffer agreement to render his statements inadmissible in the People's case-in-chief. The People did not act with unclean hands in moving to admit evidence that is, in fact, admissible.

## II. Insufficiency of the Evidence Based on Alicia's Status as an Accomplice as a Matter of Law

In a series of interrelated arguments, defendant contends that (1) Alicia was an accomplice as a matter of law, so the trial court erred in not so instructing the jury and instead allowing the jury to decide whether she was an accomplice, and (2) Alicia's status as an accomplice as a matter of law means that the People were required to adduce evidence corroborating her testimony, so the People's failure to do so means that there is insufficient evidence to sustain defendant's convictions. We independently review each of these claims. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579 [instructional error]; *People v. Cole* (2004) 33 Cal.4th 1158, 1213 [sufficiency of the evidence].) In evaluating the sufficiency of the evidence, we ask only whether the record

18

contains "'substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 942.) In undertaking this inquiry, we "'review the whole record in the light most favorable to the judgment below'" (*ibid.*), which includes "resolv[ing] conflicting inferences" and credibility findings in favor of that judgment. (*People v. Casares* (2016) 62 Cal.4th 808, 823, overruled on other grounds in *People v. Dalton* (2019) 7 Cal.5th 166; *People v. Reed* (2018) 4 Cal.5th 989, 1006.)

## A. *Instruction declaring Alicia to be an accomplice as a matter of law*

A defendant's conviction cannot rest upon "the testimony of an accomplice" unless that testimony is "corroborated" by "other evidence" that "tend[s] to connect the defendant with the commission of the [charged] offense[s]." (§ 1111.) The testimony of an accomplice requires corroboration because accomplices—unlike other witnesses—"'usually testif[y] in the hope of favor or the expectation of immunity' [citation]" and "may try to shift blame to the defendant in an effort to minimize his or her own culpability." (*People v. Tobias* (2001) 25 Cal.4th 327, 331; accord, *People v. Sanmiego* (2009) 172 Cal.App.4th 1148, 1177.)

For these purposes, an "accomplice" is "defined as one who is liable to prosecution for the identical offense[(s)] charged against the defendant" in that case. (§ 1111.) "To be chargeable with an identical offense, a witness must be considered a principal under section 31." (*People v. Lewis* (2001) 26 Cal.4th 334, 368-369.) Under section 31, a principal is a person who either "directly commit[s]" the crime or who "aid[s] and abet[t]s in its commission." (§ 31; *People v. Stankewitz* (1990) 51 Cal.3d

19

72, 90 (*Stankewitz*) [principals include aiders and abettors]; *People v. Tewksbury* (1976) 15 Cal.3d 953, 960 [same].)  To be an aider and abettor, a person must (1) do something to aid, promote, or encourage the charged crime(s), (2) while knowing of the perpetrator's unlawful purpose, and (3) while intending to encourage the crime(s).  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054; *Clark*, *supra*, 63 Cal.4th at p. 606; *People v. Beeman* (1984) 35 Cal.3d 547, 561.)  A person is *not* an aider and abettor because she (1) is merely present when the crime is committed unless her presence was intended to—and did—encourage the crime (*Lewis*, *supra*, 26 Cal.4th at p. 369; *Stankewitz*, *supra*, 51 Cal.3d at p. 90; *People v. Swanson-Birabent* (2003) 114 Cal.App.4th 733, 744), (2) knows that the crime will be committed (*Lewis*, at p. 369; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530), or (3) fails to prevent the crime unless she otherwise had a duty to do so (*Swanson-Birabent*, at p. 745).

Who decides whether a witness is an accomplice?  Usually, the jury decides.  (*Clark*, *supra*, 63 Cal.4th at p. 606; *Stankewitz*, *supra*, 51 Cal.3d at p. 90; *People v. Rodriguez* (1986) 42 Cal.3d 730, 759 (*Rodriguez*).)  However, the court may decide that a witness is an accomplice """"as a matter of law"""" """"when the facts regarding the witness's criminal culpability are 'clear and undisputed'"""" and thus """"permit only[] [the] single inference"""" that the witness is an accomplice.  (*Clark*, at p. 606, quoting *People v. Riggs* (2008) 44 Cal.4th 248, 312; see *People v. Boyce* (1980) 110 Cal.App.3d 726, 736 [where "inferences" are "conflicting," witness's status as an accomplice is "for the jury"].)

Applying the above-stated definitions, Alicia was not an accomplice as a matter of law because the evidence as to whether

20

she was a principal in Jacqueline's murder and kidnapping was conflicting rather than "clear and undisputed."

There was conflicting evidence as to whether Alicia was a principal in Jacqueline's murder. The evidence as to whether Alicia directly perpetrated the murder was conflicting: Although Grimaldi told several people after the fact that Alicia had pulled the trigger and killed Jacqueline, Alicia steadfastly denied pulling the trigger. The evidence as to whether Alicia aided and abetted the murder was also conflicting. Alicia was certainly present when Grimaldi killed Jacqueline; she knew that Grimaldi, Sandoval and defendant intended to kill Jacqueline; and she did not do anything to stop the killing. As explained above, however, these facts are insufficient to make Alicia an aider and abettor *at all*—let alone an aider and abettor *as a matter of law*. Alicia also had no duty to stop the killing; Alicia took no actions that could be viewed as unequivocally aiding or encouraging the killing, as taking Jacqueline to freshen up at Ana's apartment is just as reasonably viewed as an act of compassion as an attempt to calm Jacqueline down and thus facilitate the killing intended by the others, and Alicia did not drive to the park, did not bring a weapon, and denied acting as a lookout; and Alicia disclaimed any intent to kill Jacqueline, a disclaimer confirmed by the facts that she feared Grimaldi, that she asked Ana's boyfriend to come along to protect her from Grimaldi, and that Grimaldi had to drag Alicia by her hair and had to wrestle the gun into her hand. (See *People v. Williams* (2008) 43 Cal.4th 584, 637-638 [where witness "denie[s] he had the intent to further [the direct perpetrator's] criminal purpose," witness is not an accomplice as a matter of law]; *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1376 [same].) To be sure,

21

the jury could have rejected Alicia's testimony and found that Alicia acted as a lookout, while knowing of the others' plan to kill Jacqueline and sharing their intent to kill her. But the evidence was in conflict, and thus precluded a finding that Alicia was an accomplice as a matter of law.

There was also conflicting evidence as to whether Alicia was a principal to Jacqueline's kidnapping to facilitate the rape and commission of lewd acts. Given that Alicia was one of five people (aside from Jacqueline) who traveled from the MacArthur Park neighborhood to Elysian Park, the analysis for whether she directly perpetrated the kidnapping, or instead aided and abetted it, is largely the same. And the evidence to support either analysis was conflicting: Alicia was present for the kidnapping, knew that the others planned to rape Jacqueline and commit lewd acts upon her, and did not stop them. But Alicia also had no duty to stop the kidnapping, took no actions that could be viewed as unequivocally supporting or encouraging the kidnapping, and disclaimed any intent to kidnap or otherwise harm Jacqueline. Once again, the jury could have found Alicia to have been a principal, but the evidence on that issue was conflicting. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 94 [evidence sufficient to permit a finding does not compel that finding as a matter of law].)

Defendant responds with two arguments.

First, defendant asserts that the prosecutor *conceded* that Alicia was an accomplice as a matter of law. The record does not support this assertion: The prosecutor acknowledged only that Alicia "would be an accomplice if she did those things with the intent to kill the victim"; the prosecutor did not concede that Alicia *had* the intent to kill the victim.

22

Second, defendant contends that the defense of duress is unavailable to excuse Alicia's actions because (1) duress is not a defense to the crime of murder (*People v. Burney* (2009) 47 Cal.4th 203, 249), and (2) duress requires an "immediate[] and "imminen[t] . . . threat[]" of harm (*People v. Vieira* (2005) 35 Cal.4th 264, 290), and the gang retaliation Alicia feared was too remote to constitute duress in the commission of the kidnapping. But whether Alicia could have availed herself of the defense of duress is ultimately beside the point. That is because duress is a defense that negates criminal intent (*People v. Heath* (1989) 207 Cal.App.3d 892, 901; *People v. Petznick* (2003) 114 Cal.App.4th 663, 676), and the evidence as to whether Alicia possessed criminal intent in the first place is in conflict—and this conflict is itself sufficient to preclude a finding that Alicia was an accomplice as a matter of law. The unavailability of duress as a defense does not wipe away the conflicting nature of the evidence on the precursor question of Alicia's intent.

For these reasons, the trial court correctly refused to instruct the jury that Alicia was an accomplice as a matter of law.

### B.    *Sufficiency of the evidence*

Because Alicia was not an accomplice as a matter of law, it was up the jury to decide whether she qualified as an accomplice. If she did not, then the People were not required to corroborate her testimony. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 432; *People v. Sternberg* (1896) 111 Cal. 3, 9; *Gonzalez*, *supra*, 246 Cal.App.4th at p. 1378.) Because no one disputes that Alicia's testimony, if accepted, amply supported defendant's convictions for aiding and abetting Jacqueline's murder and kidnapping to commit rape and the commission of lewd acts, whether defendant's convictions may stand turns on

23

whether sufficient evidence supported the jury's implicit finding that Alicia was not an accomplice to the murder or the kidnapping.

We conclude that it did. To be sure, the jury had an ample basis to question Alicia's credibility. Alicia had a motive to fabricate, as she admitted to (1) cooperating with law enforcement to avoid deportation and the loss of her children, (2) receiving payments from law enforcement, and (3) disliking defendant. Alicia's recounting of events changed over time: In 2006, she omitted Contreras's role as the driver and said that Sandoval (her former boyfriend) had been the driver and had stayed in the car, omitted that Ana's boyfriend came along with her, and said defendant only wanted Jacqueline to be beaten up; in 2011, Alicia omitted that she took Jacqueline up to Ana's apartment, and said defendant had little influence in the MS-13 gang; and in her 2012 grand jury testimony, Alicia omitted her struggle with Grimaldi over the gun and testified both that she did not pull the trigger and that she could not tell whose finger—hers or Grimaldi's—pulled the trigger. Alicia's recounting of events even varied during her trial testimony: Alicia testified that defendant ordered the group to "get rid of" Jacqueline, to "let her go" after they had sex with her, and to both "get rid of" her *and* "let [her] go"; Alicia also testified that she cut off the hand of the man who raped her when she was 10 years old, and that she just "cut his hand" without severing it.

But none of these inconsistencies permit us to second-guess the jury's decision to credit the portions of Alicia's testimony supporting defendant's convictions. Adjudging witness credibility is "'the exclusive province of the trier of fact'" (*People v. Gomez* (2018) 6 Cal.5th 243, 281), and we may gainsay a jury's

24

credibility findings regarding a witness only when the witness's "testimony is physically impossible or its falsity is apparent 'without resorting to inferences or deductions.'" (*People v. Cudjo* (1993) 6 Cal.4th 585, 608; accord, *People v. Friend* (2009) 47 Cal.4th 1, 44; *Fuentes v. AutoZone, Inc.* (2011) 200 Cal.App.4th 1221, 1233.) Alicia's testimony claiming that she did not pull the trigger and did not intend to kill or kidnap Jacqueline was neither physically impossible nor false on its face.

For these reasons, there was sufficient evidence to support the jury's finding that Alicia was not an accomplice, such that there was no need for the People to adduce evidence corroborating her testimony. Because Alicia's testimony is sufficient to prove defendant's guilt of the crimes of murder and kidnapping charged in this case, we reject defendant's challenge to the sufficiency of the evidence.

## III. Cumulative Error

Defendant argues that the cumulative effect of the trial court's errors in admitting his proffer statements and in failing to instruct the jury that Alicia was an accomplice as a matter of law warrants reversal. We disagree. Because these individual claims lack merit, there is no error to cumulate. (*People v. McWhorter* (2009) 47 Cal.4th 318, 377.)

## IV. Remand to Apply Newly Conferred Sentencing Discretion

Defendant lastly argues that this case should be remanded to give the trial court the opportunity to consider whether to exercise its discretion, conferred by Senate Bill No. 620 (SB 620), to dismiss the firearm enhancements. (§ 12022.53, subd. (h).) Although this newfound discretion applies retroactively to all cases not yet final on direct appeal (*People v. Arredondo* (2018) 21

25

Cal.App.5th 493, 506-507), we conclude that no remand is warranted in this case for two reasons.

First, SB 620 became effective on January 1, 2018. Defendant was sentenced nearly 18 months later—on June 21, 2019. Although the trial court did not discuss its authority to dismiss the firearm allegations, its silence on this point is of no consequence because, "[i]n the absence of . . . evidence to the contrary, we must presume the [trial] judge was aware of his [or her] discretion and chose not to exercise it." (*In re Consiglio* (2005) 128 Cal.App.4th 511, 516); see *People v. Mosley* (1997) 53 Cal.App.4th 489, 496 ["The general rule is that a trial court is presumed to have been aware of and followed the applicable law"].) Here, there is no evidence to the contrary. Although, as defendant notes, SB 620 was a relatively recent change in the law, the presumption that trial courts are aware of their discretion is not limited to discretion that has been "on the books" for longer than a certain period of time; and even if it did, nearly 18 months is certainly long enough. Defendant cites a passage from the sentencing hearing where the trial court indicates that it was "required to do so," but the court was referring to having to stay the gang enhancement due to its imposition of the firearm enhancement—not having to impose the firearm enhancement in the first place. If anything, the court's remark that it had to stay the gang enhancement indicates its desire *not* to stay that additional punishment.

Second, and even if we assume that the trial court had been unaware of its discretion to dismiss the firearm enhancements, a remand to exercise discretion is not appropriate when "the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such

26

discretion.'" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391; *People v. Chavez* (2018) 22 Cal.App.5th 663, 713.) Here, the trial court denied defendant's motion to strike the special circumstance finding after finding him to be "the reason all these acts took place" and declined to impose concurrent sentences on the murder and kidnapping convictions in favor of imposing consecutive sentences. The court's unwillingness to cut one lifetime off of defendant's sentence "clearly indicate[s]" that the court would not cut 25 or 50 years off that sentence.

## DISPOSITION

The judgment is affirmed.

## **CERTIFIED FOR PARTIAL PUBLICATION**.


_____, J.
HOFFSTADT


We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
CHAVEZ

27